**TEXAS WEST OIL AND GAS CORPORATION and Bob Johnson, Appellants (Plaintiffs),**

v.

**D.N. FITZGERALD, Appellee (Intervenor),**

**Oil Patch Sales and Rentals of Wyoming, Inc., a Wyoming corporation, Appellee (Defendant).**

**D.N. FITZGERALD, Appellant (Intervenor),**

v.

**TEXAS WEST OIL AND GAS CORPORATION and Bob Johnson, Appellees (Plaintiffs),**

**Oil Patch Sales and Rentals of Wyoming, Inc., a Wyoming corporation, (Defendant).**

Nos. 86–9, 86–10.

Supreme Court of Wyoming.

Oct. 21, 1986.

Rehearing Denied Nov. 21, 1986.

Jeffrey C. Gosman, Casper, for Texas West Oil and Gas Corp. and Bob Johnson.

Harold E. Meier of Schwartz, Bon, McCrary & Walker, Casper, for D.N. Fitzgerald.

Susan Maher Overeem, Casper, for Oil Patch Sales and Rentals of Wyoming, Inc.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

These two cases have their origins in the same contract. We will first consider the facts relating to the dispute between plaintiffs Texas West Oil and Gas Corporation (Texas West) and Bob Johnson and defendant Oil Patch Sales and Rentals of Wyoming, Inc. (Oil Patch).

Texas West is in the business of exploring for, developing, and producing oil and gas. On June 1, 1981, Texas West agreed to purchase a drilling rig from Oil Patch. The contract provided for a $500,000 payment on the day of execution and four monthly payments of $750,000. The contract also stated that the price to be paid for the drilling rig was approximately $5.1 million with "exact figures to be made definite and certain by agreement of the parties, or if unable to be agreed upon, by arbitration, and is to be based upon actual costs of Seller as well as time involved in construction." Finally, the contract provided that it was anticipated that the rig would be completed in October 1981.

Although Texas West paid the $3.5 million required by the contract, Oil Patch could not deliver the rig as the parties had anticipated because of problems with the delivery of the rig's drawworks to Oil Patch. After the parties had discussed the problems with the drawworks, Oil Patch sent Texas West a letter on February 19, 1982, in which Oil Patch requested that Texas West select substitute drawworks, pay the additional cost for these substitute drawworks, and advance the balance of the contract. At the same time, Oil Patch offered the alternative of delivering the rig without the drawworks in exchange for the balance of the contract price less the cost of the drawworks. Texas West responded by stating that the delivery date of " 'during the first two weeks of October, 1981' " was crucial and that Oil Patch had failed to fulfill the contract. In addition, Texas West stated that the $5.1 million figure was only an approximation; that Oil Patch had not shown expenditures of nearly that amount; and that the contract price could be less than $5.1 million.

Texas West filed a complaint against Oil Patch in October 1982 asserting that Oil Patch had breached the contract by failing to complete and deliver the rig. The complaint sought possession of the rig as well as damages allegedly caused by the breach. Oil Patch answered and asserted that it was impossible to complete the rig with the drawworks originally set out in the contract and that Texas West had refused to specify substitute drawworks which it would accept and had repudiated the contract. Oil Patch counterclaimed for the balance of the purchase price—i.e., $5.1 million—less any setoffs and sought incidental damages it claimed to have suffered from Texas West's repudiation.

After Oil Patch requested that the issue of the purchase price be submitted to arbitration, the parties entered into a stipulation in which they agreed to submit all legal and factual issues in the dispute to an arbitration panel. After a hearing in April 1984, the arbitration panel concluded that the contract price was $5.1 million with a provision in case of any overrun of costs beyond that amount. Because the rig was not completed, the panel awarded Oil Patch the contract price of $5.1 million minus the cost of completing the rig, which the panel found to be $1,133,000, and the down payment of $3.5 million.[1] The panel also found that Texas West should pay interest on the balance of the contract price from March 1, 1982.

Texas West moved in district court to vacate or modify the arbitration award, while Oil Patch asked for an order confirming the award. The district court determined that the award should not be set aside or modified (except for the $100,000

---

1. This results in an award of $467,000. The arbitration panel miscalculated and stated that the award would be for $567,000. Neither party disputes that the panel meant $467,000.

arithmetic error) and accordingly entered an order confirming the award and dismissing the motion to vacate or modify. Texas West has appealed from this order.

We are also presented with the dispute which, although connected with the contract between Oil Patch and Texas West, now involves as parties D.N. Fitzgerald and Texas West. Fitzgerald was not named in the original complaint filed by Texas West against Oil Patch, but he intervened because he claimed to hold a security interest in the inventory of Oil Patch, which included the rig Texas West sought to possess. After Fitzgerald intervened, Texas West amended its complaint joining Fitzgerald and others as defendants. In its amended complaint, Texas West alleged that Fitzgerald intentionally interfered with the contract between Oil Patch and itself, which caused Texas West to suffer damages.

Fitzgerald had been an original incorporator and vice president of Oil Patch. As such he agreed to guarantee the corporation's loans from First Interstate Bank of Casper, N.A. (Bank). Although he resigned as a director of Oil Patch in March 1981, the Bank did not release Fitzgerald from his guaranty of $500,000. In fact, in April 1982 Fitzgerald increased the guaranty to $1.1 million. This guaranty became important because Oil Patch borrowed approximately $1.1 million from the Bank as it worked on completing the rig for Texas West. In addition to Fitzgerald's guaranty, in March 1982, the Bank also acquired a security interest in all of Oil Patch's inventory and accounts receivable, which included the rig. By September 1982, the loans had become past due, and the Bank asked Fitzgerald to honor his guaranty. Fitzgerald did so and received the note and security interest previously held by the Bank.

Texas West asserts that Fitzgerald induced the Bank to take the lien on the rig. Then Fitzgerald assumed control over the disposition of the rig, requiring that additional money be paid under the contract between Oil Patch and Texas West in order to protect himself from liability on the guaranty. These actions induced Oil Patch to breach the contract by requiring more than the contract price before it would deliver the rig. These actions also form the basis for Texas West's claim against Fitzgerald.

Texas West's claim against Fitzgerald was tried before a jury which found that Fitzgerald had interfered with the contract between Oil Patch and Texas West. The jury also found that as a result Texas West suffered damages of $4 million. Fitzgerald moved for a judgment notwithstanding the verdict (JNOV) or alternatively for a new trial or remittitur. The trial court denied the motion for JNOV but granted the motion for a new trial unless Texas West consented to a remittitur of $3,431,675. Texas West has appealed from this order, and Fitzgerald has taken a cross-appeal from the portion of the order denying his motion for JNOV.

## ARBITRATION AWARD

The order of the district court affirming the arbitration award is affirmed.

The motion of Texas West merely stated that the arbitration award should be vacated or modified for any and all reasons allowed or contemplated by law.

According to the brief of Texas West filed in the district court in support of its motion, Texas West contended that the award should be set aside because it is a manifest mistake of law to award full profit on a contract which the seller failed to perform. In the alternative, Texas West contended that the award should be modified (1) to reduce the award by $226,000, which it claims is the ratio of profit for the portion of the rig not completed; (2) to reduce the award to reflect the $100,000 arithmetic error; (3) to strike the requirement for the payment of interest and attorney's fees; and (4) to require Oil Patch to convey title to the incompleted oil rig to Texas West upon receiving payment of any unpaid balance owed by it.

In its brief in opposition to the motion of Texas West, Oil Patch contended that the

motion was insufficient in that it did not state with particularity the grounds therefor as required by Rule 7(b)(1), W.R.C.P., which provides in part that:

"An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, [and] *shall state with particularity the grounds therefor * * *.*" (Emphasis added.)

Oil Patch further contends in its brief that Texas West has failed to show any clear and convincing reason why the award should be vacated on any of the grounds enumerated in § 1–36–114(a), W.S.1977, which provides that the court shall vacate an arbitration award where:

"(i) The award was procured by corruption, fraud or other undue means;

"(ii) There was evident partiality by an arbitrator appointed as a neutral, corruption of any of the arbitrators or misconduct prejudicing the rights of any party;

"(iii) The arbitrators exceeded their powers;

"(iv) The arbitrators refused to postpone the hearing upon sufficient cause being shown, refused to hear evidence material to the controversy or otherwise conducted the hearing as to prejudice substantially the rights of a party; or

"(v) There was no arbitration agreement, the issue was not adversely determined by a court as provided by law and the applicant did not participate in the arbitration hearing without raising the objection. The fact that the relief was such that it could not or would not be granted by a court of law or equity is not a ground for vacating or refusing to confirm the award."

Although the court's order contained a statement recognizing that Texas West's motion did not specify the grounds for vacation or modification, it appears from the judge's decision letter that the motion was not denied for such reason and that the order is based on counsels' arguments tracking their briefs.

Texas West presents the following issues relating to the arbitration award for review before this Court:

"Did the District Court err in refusing to vacate the arbitration award as a manifest injustice where the buyer under a contract for sale is forced to pay full profit on a contract to a defaulting seller, who has refused to complete and deliver the contract goods under the terms of the contract?

"Did the [D]istrict [C]ourt err in confirming the arbitration award of interest at 2% above the First Interstate Bank of Casper, N.A., prime rate on an unliquidated sum for a period which began to run two (2) years prior to the arbitration award?

"Did the District Court err in not vacating the award of interest as being in excess of the arbitration panel's authority?"

Oil Patch has addressed the issues of Texas West by restating them as follows:

"Did the Trial Court err in refusing to vacate the arbitration award as a manifest injustice?

"Did the District Court err in confirming the arbitration award of interest?

"Did the District Court err in not vacating the award of interest as being in excess of the arbitration panel's authority?"

The second and third issues were not presented to the district court for disposition by trial brief or otherwise. It is, therefore, not appropriate for this Court to now determine whether or not the arbitration award should be vacated for those specific reasons. *Dennis v. Dennis,* Wyo., 675 P.2d 265 (1984).

In dealing with the first issue of Texas West, Oil Patch continues to contend that the only time an arbitration award can be vacated is when an applicant pleads and proves one of the grounds set out in § 1–36–114(a). We do not agree. The statute merely states that the court *must* vacate the award if any of the grounds stated therein exists. The statute does not pro-

**1062**

hibit the district court from vacating an award on other grounds. We have said before that an award can also be vacated if it

"was obtained by fraud, corruption, behavior beyond the bounds of natural justice, excess of authority, or a manifest mistake of fact or law appearing upon the face of the award * * *." *Riverton Valley Electric Association v. Pacific Power and Light Company*, Wyo., 391 P.2d 489, 500 (1964).

We have also stated that arbitration is a method of voluntary settlement of disputes embedded in the public policy of Wyoming and is favored by this Court, that this Court is reluctant to disturb arbitrators' just solutions to controversies, and that before we will upset a district court decision upholding an arbitration award, the applicant must have discharged its proof burden with clear and convincing evidence. *Northern Supply Company v. Town of Greybull*, Wyo., 560 P.2d 1172 (1977).

■ We have examined the arbitration panel's award, and we are unable to find that Oil Patch realized any profit much less a profit of $226,000. To arrive at this amount we must find, as Texas West contends, that the $3.5 million it advanced equals the actual costs expended by Oil Patch to get the oil rig in the stage of construction in which it existed when the dispute arose. We are unable to do this any more than we could find that Oil Patch expended $1 million or $4 million. It may be that Oil Patch anticipated that it would make a profit when the rig was completed, but Texas West has wholly failed to draw our attention to any document or testimony which was before the arbitration panel indicating that Oil Patch did so. The contention of Texas West is based on an unwarranted assumption. For this reason we hold that Texas West has failed to sustain its burden and that the district court, therefore, did not err in entering judgment affirming the arbitration award.

### CONTRACT INTERFERENCE

Texas West alleged that Fitzgerald intentionally interfered with the contract between Oil Patch and itself. This action was tried before a jury which returned a $4 million verdict in favor of Texas West. On appeal Fitzgerald presents the following issues:

"THE COURT ERRED IN NOT GRANTING A JUDGMENT NOTWITHSTANDING THE VERDICT IN THAT THERE WAS NO EVIDENCE FROM WHICH A JURY COULD FIND:

"A. That D.N. Fitzgerald interfered with the contract between Texas West Oil and Gas [C]orporation and Oil Patch Sales and Rentals of Wyoming, Inc.; or

"B. The amount of any damages sustained as a result of any interference.

"THE COURT ERRED IN NOT GRANTING A JUDGMENT NOTWITHSTANDING THE VERDICT IN THAT THE INTERVENOR PRESENTED [A] DEFENSE WHICH ENTITLED HIM TO JUDGMENT AS A MATTER OF LAW."

Texas West also presents the following issue relating to damages for contract interference:

"Did the District Court err in applying an incorrect legal standard in determining that the jury verdict against the intervenor, D.N. Fitzgerald, was excessive and shocked the conscience of the Court?"

■ In order to establish the claim of tortious interference with a contract, the plaintiff must prove the following elements: (1) the existence of the contract; (2) the defendant's knowledge of the contract; (3) intentional interference with the plaintiff's contract without justification; and (4) resulting damages. *Basin Electric Power Cooperative-Missouri Basin Power Project v. Howton*, Wyo., 603 P.2d 402 (1979).

■ When making a determination of whether or not a trial court should have directed a verdict, this Court considers the evidence favorable to the party against whom the motion is directed and gives that

evidence all reasonable inferences. *Carey v. Jackson*, Wyo., 603 P.2d 868 (1979).

There being no question that a contract existed and that Fitzgerald had knowledge of it, we have carefully examined the record on appeal to determine whether Fitzgerald unjustifiably interfered with the contract and, if so, whether Texas West suffered damages as a result.

■ The evidence favorable to Texas West concerning Fitzgerald's unjustifiable interference shows that even after problems developed with the delivery of the drawworks, the relationship between Texas West and Oil Patch was amicable. On February 19, 1982, however, Gordon Gibson of Oil Patch sent a letter to Texas West offering it the alternative of either paying the $1.6 million balance of the $5.1 million purchase price, less the cost of the drawworks, or paying the cost of the new drawworks, along with advancing the balance of the purchase price for the completed rig. Gibson testified that this was the first time the question of additional money was discussed between Texas West and Oil Patch. This additional money, according to Gibson, was to be applied toward the $508,000 which Oil Patch owed to the Bank on an unsecured loan guaranteed by Fitzgerald.

On February 11, 1982, John A. Milliken, the Bank's loan officer, contacted Fitzgerald concerning Oil Patch's obligations to the Bank and Fitzgerald's guaranty. Fitzgerald asked the Bank to take a lien on the inventory (including the rig) and accounts receivable of Oil Patch. The Bank took the security, and during the month of April 1982, Fitzgerald increased his liability on the guaranty to $1.1 million. This new guaranty was given even though the Bank made no commitment to loan Oil Patch additional money or extend the time for any existing loans.

In the meantime, Texas West was attempting to finalize an agreement with a third party for a joint venture to finish the rig and put it to work. L.N. Dunnavant, president of Texas West, testified that on June 19, 1982, Gibson denied the existence of any lien on the rig which would prevent Texas West from taking the rig. Thereafter, Gibson admitted that a lien existed and that the matter was out of his hands. Dunnavant then attempted to speak with the person " 'who [was] calling the shots,' " and, as a result of a conversation he had with Tom Harries, one of the principals of Oil Patch, he contacted Fitzgerald who told him that in order to take the rig Texas West would have to pay the Bank the $508,000 and that there was no negotiation on that point.

We find from this evidence and the inferences that may be drawn therefrom that Fitzgerald intentionally and without justification interfered with the contract between Oil Patch and Texas West.

■ Having found that there was sufficient evidence presented to the jury to find that Fitzgerald unjustifiably interfered with the contract between Oil Patch and Texas West, we must now determine whether or not there was sufficient evidence presented to the jury to find that such actions damaged Texas West.

There was evidence presented to the jury that the market value of the rig without the drawworks was approximately $3.2 million during the times of the interference and that the rig would have been worth at least $4 million if Oil Patch had completed the rig with the drawworks. It is possible that the jury used this measure of damage when it returned its verdict of $4 million.

Texas West contends that it lost the rig as a result of Fitzgerald's interference, and its damages, therefore, should be the market value of the rig.

The cases upon which Texas West relies concern market value as a measure of damage for the loss or destruction of personal property. *Rocky Mountain Packing Co. v. Branney*, Wyo., 393 P.2d 131 (1964); *Rogers v. Hansen*, Wyo., 361 P.2d 676 (1961). We are unable to conclude or infer from the evidence presented to the jury that Texas West lost the rig. The inference is that Fitzgerald interfered with the delivery of the rig to Texas West.

We, therefore, hold that the trial judge did not abuse his discretion in not applying market value as the applicable standard of damages when he determined that the jury verdict against Fitzgerald was excessive and shocked the conscience of the court.

■ We have previously held that the measure of damages for intentional interference is the amount which will compensate for all of the detriment proximately caused by the breach of duty. *Martin v. Wing*, Wyo., 667 P.2d 1159 (1983).

Omer Bishop testified that he had access to a drawworks through one of his companies and that he and Dunnavant, on behalf of Texas West, attempted to negotiate a deal to complete the rig and put it to work. Bishop further testified that he was "dead serious" about the venture but, according to the testimony of Dunnavant, the deal was killed when Fitzgerald refused to allow the rig to be delivered before payment was made to release the lien on the rig.

The jury could have properly found that Fitzgerald's interference was the proximate cause of Texas West and Bishop not getting together to complete and put the rig to work and that Texas West was damaged thereby. The jury could also have found, as Texas West contends, that Fitzgerald's interference was the proximate cause of the nondelivery of the rig and that Texas West's damage equaled the investment value of the rig.

Although the extent and the amount of damages which may have resulted from Fitzgerald's interference are difficult to ascertain, we find that there was sufficient evidence presented to the jury for it to find that Texas West was damaged.

■ Fitzgerald's defense is that "the taking of a Security Agreement for consideration is, as a matter of law, not interference of any contractual rights" and that he, therefore, should have been entitled to a directed verdict. It was the Bank which took the security agreement. Fitzgerald was the guarantor. We do not find as a matter of law that Fitzgerald's position as a guarantor entitled him to induce Oil Patch to withhold delivery of the rig until Texas West made sufficient additional payments to protect him from liability on his guaranty.

We, therefore, hold that Fitzgerald's defense is untenable and that the court did not err in refusing to grant a judgment for Fitzgerald notwithstanding the verdict.

## REMITTITUR—NEW TRIAL

Texas West presents the following issues relating to a remittitur or new trial:

"Did the District Court abuse it's [sic] discretion in ordering a remittitur or new trial?

"Did the District Court abuse it's [sic] discretion in not ordering a new trial as to damages only, when the District Court expressly found that there was sufficient evidence to support the jury verdict finding liability against the intervenor D.N. Fitzgerald for interference with the Plaintiff's contract?"

■ The power to order a new trial for excessive damages is committed to the sound discretion of the trial court. *Cody v. Atkins*, Wyo., 658 P.2d 59 (1983). The trial court also has authority to order a complete new trial or one limited to damages when the verdict is excessive. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2815 (1973); *Smith v. Blair*, Wyo., 521 P.2d 581 (1974). The standard for appellate review of a trial judge's order granting a new trial for an excessive damage verdict is whether the trial court abused its discretion. *Taylor v. Washington Terminal Company*, 409 F.2d 145 (D.C.Cir.), cert. denied 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969).

Texas West's contention that the court abused its discretion in ordering a remittitur or a new trial because it did not apply the market value as a standard of measuring damages is untenable. As we previously stated, this measure of damages is not applicable when the interference merely causes a delay in the delivery of personal property.

▇ In the case at bar, the question of whether or not Fitzgerald interfered with the contract between Texas West and Oil Patch was vigorously contested and properly decided. The trial court on three different occasions [2] found that there was sufficient evidence presented to the jury to find for Texas West on the issue of interference by Fitzgerald.

We find that it would be unfair to compel Texas West to risk another trial on all of the issues solely because the trial court found damages to be excessive. To do so when, as in this case, the issues of liability and damages can be separated without creating confusion, inconvenience, or prejudice to Fitzgerald is an abuse of the trial court's discretion. Texas West should not be penalized for not consenting to a remittitur.

▇ Although Rule 59(a), W.R.C.P., pertains to the authority of trial courts to remand for retrial on all or part of the issues, this Court possesses equivalent authority to order a partial new trial. *Wheatland Irrigation District v. McGuire*, Wyo., 562 P.2d 287 (1977).

The order confirming the arbitration award is affirmed, and the case is remanded for a new trial on the issue of damages only.

THOMAS, Chief Justice, specially concurring.

I concur in the affirmance of the judgment against D.N. Fitzgerald. Recognizing the significance of the problems which have been raised in the dissenting opinion of Justice Urbigkit, especially the law's requirement that there be wrongful interference which causes breach of an existing contract, the record does disclose that subsequent to the events early in 1982 Texas West Oil and Gas Corporation and Oil Patch Sales and Rentals of Wyoming, Inc.,

were discussing resolutions to their situation. A part of those discussions involved an adjustment to the contract in the nature of a novation. In this regard Instruction No. 12 advised the jury as follows:

"In Wyoming the party has the right to be free from the intentional interference with the right to conduct negotiations that have a reasonable probability of resulting in a contract."

It appears to have been arguable that the security interest held by the First Interstate Bank of Casper, N.A. did not extend to the work in progress, i.e., the drilling rig. The Bank then expended substantial effort in obtaining an amendment to the security agreement and financing statement, the effect of which was to make the drilling rig unequivocally subject to the security agreement. The record would justify the jury's conclusion that this was done at the insistence of Fitzgerald, and would also justify a conclusion that the extension of the security interest to the drilling rig inhibited and perhaps prevented the efforts of Texas West Oil and Gas Corporation and Oil Patch Sales and Rentals of Wyoming, Inc., to resolve their differences by substituting a different contractual arrangement. I am satisfied that the facts and the law do support the jury's determination that there was wrongful interference by D.N. Fitzgerald.[1]

I must dissent from the disposition by this court which remands the case for a new trial on the issue of damages only. The district court ordered a remittitur or in the alternative a new trial. Whether the new trial should be a complete new trial or a limited new trial is a matter which I perceive to be placed within the discretion of the district judge and which may well depend upon his perception of how much leverage is required to induce the plaintiff to accept the remittitur.

*Missouri Basin Power Project v. Howton*, Wyo., 603 P.2d 402, 404–405 (1979). One in Fitzgerald's position is entitled to all of the Bank's rights on an obligation which he has guaranteed when he satisfies it, but he has no lawful basis for enhancing or creating any rights.

**2.** Motion for directed verdict, motion for judgment notwithstanding the verdict, and the court's finding in its order and judgment.

**1.** Whether interference is without justification or improper is a question of fact for the jury not one of law. *Basin Electric Power Cooperative-*

The trial court has wide discretion concerning the propriety of granting a new trial. *Cody v. Atkins*, Wyo., 658 P.2d 59, 63–64 (1983). I do not read the majority opinion as reaching a conclusion that there was an abuse of the trial court's discretion in this regard. I do not think the record would justify such a conclusion. Yet, in the absence of that conclusion what has occurred is that this court has substituted its discretion for that of the district court. Since principles of jurisprudence foreclose the substitution of our discretion for that of the district court, I would remand the case for a new trial on both the issues of liability and damages.

URBIGKIT, Justice, concurring in part and dissenting in part.

I concur in the decision of this court to affirm the arbitration award, and respectfully and comprehensively dissent in the decision establishing guarantor liability by application of a tort theory of an intentional interference with a contract.

This is a singularly important banking-industry decision. Principles of suretyship and law merchant invoked in this case are as old as Roman law, and perhaps older.[1] Succinctly stated, this case concerns the rights retained against the principal and his assets when the guarantor is required to stand good on a guaranty. The contention of intentional interference has never been implicated in this normal lending process since earliest recorded history, and no case of this nature is either cited or presently found directly or indirectly holding that the guarantor or surety does not have the right to request protection from the principal in the event of a lender call for payment.

This convoluted and controversial field of tort law comes to this court's consideration as significantly different than any other factual situation directly addressed by discovered precedent.[2] Preliminarily, an intrinsically logical inconsistency is created in this case by affirming the arbitration decision which determined that no contractual breach occurred by nondelivery by the manufacturer in the absence of payment of the remaining amount due, and then approving third-party liability for causing the breach which had not occurred.

Unfortunately, evidentiary questions and analysis confused discussion and decision on the legal status which by established law should have been determinative.

The Texas West judgment and theory of recovery for the buyer in its claim for intentional interference should fail by application of three well-established legal principles:

(1) Guarantor does not invoke a wrongful purpose or intent by requesting that the lender obtain security position protection involving available assets of the debtor. Any claimed security position

---

1. A well-considered history ascribing the differing derivation of surety from Roman language and usage and guaranty from Teutonic history is to be found in Radin, *Guaranty and Suretyship*, 17 Cal.L.Rev. 605 (1928–29). It is contended by some authorities that the general principles and relationships involving suretyship can be dated back to the earliest history of man in a societal relationship.

2. The subject of intentional interference as a tort is comprehensively addressed by authorities and law journals which include: Note, *Leigh Furniture and Carpet Co. v. Isom: Utah's New Tort for Interference with Prospective Economic Relations*, 10 J.Contemp.Law 227 (1984); Comment, *An Analysis of the Formation of Property Rights Underlying Tortious Interference with Contracts and Other Economic Relations*, 50 U.Chi.L.Rev. 1116 (1983); Hughes and Gavin, *Commercial Torts and Deceptive Trade Practices*, 39 Sw.L.J. 123 (1985); Broida and Handler, *Tortious Interference With Contract and Prospective Advantage in Illinois*, 32 De Paul L.Rev. 325 (1982–83); Commentary, *Interference With Contractual and Business Relations in Alabama*, 34 Ala.L.Rev. 599 (1983); Comment, *Interference With Prospective Gain: Must There be a Contract?*, 22 San Diego L.Rev. 401 (1985); Note, *Tortious Interference With Contractual Relations in the Nineteenth Century: The Transformation of Property, Contract, and Tort*, 93 Harvard L.Rev. 1510 (1980); Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 40 U.Chi.L. Rev. 61 (1982); Note, *Tortious Interference with Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity*, 81 Colum.L.Rev. 1491 (1981); Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark.L.Rev. 335 (1980–81).

was only co-existent with any balance unpaid.

(2) Guarantor did not cause any breach of a contract since arbitration determined that a balance was unpaid and the principal, as the primary party in interest, would not release the drilling rig without payment receipt. No breach of contract existed.

(3) As a holder of an interest in the transaction as a debtor to be secured, the guarantor was privileged as a matter of law to seek to protect his business status in the normal business effort by the collateral assignment of business inventory and receivables.

The guarantor relationship is a subcategory of the general field of suretyship, with the commonly noted difference between a surety as a category having primary liability, and the guarantor only subject to monetary call upon default by the principal. This is the primary versus secondary liability differential. This field of law is generally called suretyship, with the procedural aspects here involved as that of guaranty. Stearns, Law of Suretyship §§ 1.1, 1.5, at 1, 4 (5th ed. 1951).

This case is a business transaction involving Fitzgerald (guarantor), First Interstate Bank of Casper, N.A. (lender), Oil Patch Sales and Rentals of Wyoming (principal and manufacturer), and Texas West Oil and Gas Corporation (buyer-customer), wherein Texas West entered into the contract to purchase a constructed drilling rig. The case accommodates not unusual construction factors of payment on delivery, completed partial payment, incomplete construction, and price conflict, with the balance then due in dispute. Stripped of the jury-trial hyperbole involving banks and buyers or contested claims of factual issues, the case is left with the following time sequences and unquestioned events:

1. December, 1980, Fitzgerald and others signed a continuing guaranty to the First National Bank of Casper (now First Interstate Bank of Casper, N.A.) to accommodate an operational line of credit for Oil Patch, a newly created entity, for a guaranteed loan total of $500,000.

2. March 30, 1981, guarantor, as a previous organizer and principal, withdrew from the operational involvement in the corporation, except for continued guarantor responsibility.

3. June 1, 1981, a drilling rig manufacture contract was executed between Oil Patch and Texas West, which contract was a model for lack of clarity and term specificity.

4. Oil Patch came to have two loans at the Bank, one unsecured except by guaranties, with an operational line of credit with a balance of $508,000, and a second of $645,000, secured by real estate mortgage on its business property in Casper.

5. On March 11, 1982, both notes were due and delinquent, and the rig was incomplete and undelivered, with controversy as to the construction contract price.

6. As a consideration of note-extension negotiations, guarantor (as well as the two others being the officers and principals in Oil Patch) re-signed a continuing guaranty in favor of the Bank in the larger amount of $1,100,000.

7. Additionally, the Bank took a security agreement and financing statement from Oil Patch involving "Any and All Accounts Receivable and Inventory," File No. U–513862.

8. The obligations of the two notes were then renewed and extended to be due in 120 days, the one for $508,000 by renewal reciting a security interest, and "S/A F/S = Any and All Inventory and Accounts Receivable"; the one for $645,000 having been extended by renewal attachment for an earlier one month to March 11, 1982, was further extended for the same 120 days, with both notes carrying an extension-period 19 percent interest rate.

9. The due date of July 9, 1982 came and went, and on September 22, 1982, the Bank made written demand on guarantor Fitzgerald to honor his guaranty (what is

known in banking as the "guaranty call"):

"As you know, on June 30, 1981, the First Interstate Bank of Casper loaned Oil Patch Sales & Rental Of Wyoming, Inc., $645,000, secured by a first mortgage on the real estate located on West Yellowstone St., in Casper, Wyoming.

"We have also loaned Oil Patch Sales & Rental of Wyoming, Inc., operating money from time to time, and at the present time have a note, secured by a first mortgage on all account receivables and inventory in the amount of $508,000.

"When our Bank entertained loan requests from Oil Patch Sales and Rental of Wyoming, Inc., the loan request was approved based upon your financial standing and your guarantee.

"Both loans are past due since July 9, 1982, with no performance to date on either loan. Interest on the building loan to September 20, 1982 is $65,-700.42, with a $340.42 per diem charge after that date. The interest due to September 20, 1982 on the inventory loan is $51,745.44, with a $268.11 charge each day after that date.

"Due to lack of promised performance on these loans, we are hereby asking you to honor your guarantee. Upon payment in full of these notes, we will assign to you, for your protection, our mortgages in the security which collatorizes each note.

"May we hear from you no later than Monday, October 4, 1982."

10. October 15, 1982, the Bank secured a second financing statement from Oil Patch, which granted as security listed equipment and included by specifically itemized inclusions the undelivered Texas West rig, which financing statement was filed October 19, 1982, in Natrona County and covered in detail the generalized collateral contained in the prior financing statement.

11. October 18, 1982, the lawsuit was instituted by Texas West to recover the rig from Oil Patch, raising the basic question of its possessory right for immediate delivery.

12. October 15, 1982, Slough Equipment Company (a company not then controlled by Fitzgerald) bought the real estate mortgage from the Bank, received an assignment of the mortgage, and commenced foreclosure by power of sale.

13. October 22, 1982, Fitzgerald, in honoring his guaranty on the line-of-credit loan, purchased the $508,000 note with accrued interest, and secured assignment of both filed financing statements.

14. This case commenced as a replevin action by Texas West (long since denied by the trial court), moved by intervention by Fitzgerald to a lien priority contest, and now comes to consider, after completed contract-price arbitration, the question of whether a guarantor "intentionally and without justification interfered" with the sales contract by the loan-renewal security document taken by the lender on the borrower's business inventory and receivables.

15. The record reflects an in-court stipulation that amounts due from Texas West as the unpaid balance are due to Fitzgerald for repayment on his guaranty payment, which amounts were settled by the arbitration award and subsequent court confirmation.

The issue in banking terms is whether a lender, or a lender at the request of a guarantor, can require collateral security upon note renewal without being subject to a claim of intentional interference with a contract. Pragmatically, also, is the question of whether there could have been interference with a contract since the question of proof of breach of contract by the principal as vendor with the vendee is an issue not otherwise determined except by prior collateral decision in an arbitration that a balance remained unpaid when the contract provided for delivery upon full payment.[3]

---

3. Texas West exhaustively briefed the issue for the trial court that Fitzgerald was constrained to

Conceding everything at this juncture to either Texas West or the majority of this court, I would consider only the intrinsic, unquestioned banking transaction and its attributes as clearly dispositive under the current status and historical perspective of the law.

Obviously, the guarantor was interested in protecting his guaranty exposure, the issue being whether the law constrains that effort as being unjustified. See *Martin v. Texaco, Inc.*, 304 F.Supp. 498 (S.D.Miss. 1969).

Otherwise stated, can a guarantor properly require or request that a lender get available security at a time of note renewal, and if so, what then did Fitzgerald wrongly do? See § 34–21–373, W.S.1977 (U.C.C. § 3–606); *Baitcher v. National Industrial Bank of Miami*, Fla.App., 368 So.2d 439 (1979); Murray, *Commercial Law*, 34 Univ. of Miami L.Rev. 527 (1979–80).

There is confusion undetermined by final litigation and unclarified by brief or oral argument, as to the right of possession in 1982, clouded by contract balance issues later determined by the contested arbitration award which now is settled by this court's decision. Since the balance due as now determined was then contested, we would have question about the issue-determined effect of the 1982 denial of replevin as not raised on this appeal.[4]

The essence of the case as a mercantile law question invoking suretyship precedent is defined in a quotation from the majority opinion:

" * * * We do not find as a matter of law that Fitzgerald's position as a guarantor entitled him to induce Oil Patch to withhold delivery of the rig until Texas West made sufficient additional payments to protect him from liability on his guaranty." 726 P.2d at 1064.

Apparently the court found that the delinquent borrower was obligated to release the rig, and further held that collateral security rights held by the lender or the lender's surety constitute wrongful interference. This determination assumes a significant fact not determined as to Oil Patch's willingness or obligation to release; in fact, the actual record was completely to the contrary.

Conceding the argument of Texas West that Fitzgerald asked the Bank to obtain security on the line-of-credit loan at the time the delinquency renewal was negotiated, and that thereafter Fitzgerald as the potential beneficiary requested that the purchase balance be paid before delivery, we have the following status:[5]

rights of subrogation in suretyship demand compliance, and consequently that his payment released the collateral security. The issue was not again addressed in this appeal. It is the "you cannot buy out, but can only pay off" argument, with the corollary that the right of subrogation does not encompass right to the available security. Since not now argued, that contention will not be further addressed except to note that lack of supporting authority is found to be further complicated by the actual security acquisition in consonance with the equitable right of subrogation. Stearns, supra, §§ 11.1, 11.7, at 439, 456; Calhoun, *Suretyship for the Iowa Lawyer*, 67 Iowa L.Rev. 219 (1981–82).

4. With present conditions in the oil industry it is generally assumed that the rig without draw works is now worth only a fraction of the original cost or contract price. Nobody really wants the rig very badly at this time. Apropos is a current quip circulating about Casper banks in the idiom of good news/bad news: the good news for new depositors is the availability of either a pen and pencil set or an oil well as a premium; the bad news is that all pen and pencil sets are gone.

5. A complete review of the entire record reveals little actual conflict in the evidence. Excluding unsustained intimations in the examination, the events of factual controversy essentially involved payment and balance due, all of which was determined by arbitration first requested by Texas West and then scheduled by stipulation between Texas West and Oil Patch. There is an inferred conflict as to the effect of what Fitzgerald said to the Bank upon note renewal, but we have assumed the favorable inference to Texas West that it had the effect of requesting security, even though the record reflects that at an earlier loan committee meeting of the Bank it was determined that in any event they would require security before note renewal.

(a) absolutely no evidence that Oil Patch agreed to release without payment, for whatever reason; [6]

(b) arbitration has now determined that a balance was due;

(c) Fitzgerald wanted money out of the rig to cover the loan balance and his guaranty;

(d) both the contract and the Wyoming statute provided that the vendor had the right to demand payment in full before release of the merchandise.

In order to define the case in some meaningful terms, since the scenario shifts in the course of the litigation, it is first necessary to ascribe times, events or actions to the "intentional interference wrongfully." The record lacks evidence to find interference, but even more so to find lack of justification in the activities of the suretyship transaction, despite an application of the usual appellate standards of considering only the evidence, when in conflict, as favorable to Texas West. *Nicholls v. Nicholls*, Wyo., 721 P.2d 1103 (1986).[7]

It would appear that Texas West contends wrongful interference in:

(a) "convincing" the lender to require the March chattel security position of inventory and receivables;

(b) not agreeing later to release of the Bank's lien and refusing to take an equity position in the rig (the evidence is conflicting as to whether the offer was made to Oil Patch or Fitzgerald, or both).

It was stipulated between the parties at trial that any contention of wrongful conduct of Fitzgerald occurred only before suit was filed, and consequently his honoring the guaranty or accepting the collateral assignment for collection assistance in subrogation and indemnity was not a claimed factor for contractual interference.

The majority opinion finds relevant evidence of interference in asking the lender to take the lien and then requiring payment without negotiation on the Bank's release, premised on the manufacturer's concurrence. This standard fails to include the improper motives, improper means, and effective cause of contractual breach determinations which are required for liability. *Leigh Furniture and Carpet Co. v. Isom*, Utah, 657 P.2d 293 (1982); *Top Service Body Shop, Inc. v. Allstate Insurance Company*, 283 Or. 201, 582 P.2d 1365 (1978).

"* * * In summary, such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other

---

6. In addition to the reimbursement and indemnity responsibilities of Oil Patch to Fitzgerald upon guaranty call, there was another reason for reluctance of the officers of Oil Patch to release assets for which a balance was claimed. Those persons, as principals in Oil Patch (Gibson and Harries) were co-guarantors, and as such have an obligation of contribution. Restatement of the Law of Security § 149 at 420. See also Calhoun, *Suretyship for the Iowa Lawyer*, supra n. 3, at 278; Stearns, supra, § 11.18 at 478. With or without inventory security in favor of the Bank, ultimate liability rested with Oil Patch, and, if then insolvent, contributory responsibility with its principals (Gibson and Harries) as co-guarantors. It is a flight of fancy to say that Fitzgerald "controlled" the nonrelease decision of Oil Patch. *Black v. O'Haver*, 567 F.2d 361 (10th Cir.1977), cert. denied 435 U.S. 969, 98 S.Ct. 1609, 56 L.Ed.2d 61 (1978); *Corinthian Corporation v. White & Bollard, Inc.*, 74 Wash.2d 250, 442 P.2d 950 (1968).

7. Two events are denominated by Texas West as causative and wrongful in the intentional-interference tort context. The first was upon note renewal. Texas West intimates what was certainly not proven but is accepted as fact for this opinion, that Fitzgerald asked the lender to get security. What was demonstrated by the evidence was that Fitzgerald "asked the bank to be sure they had their paperwork in order." The loan committee of the Bank had earlier determined that the operational loan should be collateralized before renewal.

The second event was in July, 1982, apparently after the note extension time had expired, when Fitzgerald did not agree to the lien release. The only way Fitzgerald could have controlled at that time was by (a) payoff of guaranty before call, and (b) release of his rights both as to subrogation and indemnity against Oil Patch, as well as to convince the co-guarantors who controlled Oil Patch to accept the release of the asset to the buyer.

regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession. No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant." *Top Service Body Shop, Inc. v. Allstate Insurance Company,* supra, 582 P.2d at 1371.

Texas West also finds interference in the draw-works negotiation, need for the principal to obtain money for a loan payment, surety request for the lender to obtain security for the loan renewal, additional guaranty to cover the total debt, and the Bank requesting and receiving chattel-loan security encompassing all assets, including the drill rig within the business inventory.

Assessing all of this, the issue as a legal principle is whether intentional interference occurs if a surety asks a lender to obtain security on a loan renewal in a circumstance where the manufacturer claimed a right of retention until payment was made.

I address the subject under the suretyship law principles, and lien rights of manufacturers under the Wyoming statutes:[8]

(a) Did the buyer have the right that the lender's guarantor not request security for an outstanding loan as inventory collateral?

(b) Did the seller have a right to refuse delivery, burdened by its bank financing obligations?

Addressing the second question first, the issue is complicated, since the trial court denied replevin, which became the law of the case and· is not now designated as error, and is further inflicted with the arbitration award determining that a balance remained due.

However, we can address the subject on the issue of the manufacturer's obligation to deliver under a partial purchase payment where price conflicts developed. Un-

fortunately, the issue on appeal is not addressed, but is somehow intertwined as inflicted by the creation of the lender's lien by inventory security. The principal, Oil Patch, was the finite real party in interest, since inevitably any payment by the surety created a debt, and the contract balance claimed to be due afforded the only asset for its satisfaction of the prospective debt after guaranty call.

Albeit in controversy somehow, there seems to be a blithe assumption of breach of contract by the manufacturer Oil Patch in nondelivery after the subsupplier for the draw works went into insolvency. Whether or not true, that circumstance has nothing to do with this case after the arbitration award was obtained and affirmed to establish a balance due.

Both the statute and the contract require payment for delivery. The contract provided:

" * * * [t]he balance to be paid upon completion of the rig and its delivery, presently anticipated to be during the first two weeks of October, 1982," and § 34–21–259, W.S.1977 (U.C.C. § 2–511), provides:

"(a) Unless otherwise agreed, tender of payment is a condition to the seller's duty to tender and complete any delivery."

See 4 Anderson Uniform Commercial Code § 2–511, at 7.

The trial judge, on October 19, 1982, addressed the subject by letter to counsel for Texas West:

"Upon reviewing the file and some legal authorities, it appears to me that a writ of replevin cannot issue in this case. My understanding of the law is that a buyer of goods can only maintain replevin when the contract of sale is complete. The contract here is ambiguous as to the total price. At the very least, the plaintiff would need to tender the unpaid bal-

---

**8.** An exhaustive review of suretyship principles, including exoneration, reimbursement and subrogation, as well as defenses, is found in Calhoun, *Suretyship for the Iowa Lawyer,* 67 Iowa L.Rev., supra n. 3. See also Conner, *Enforcing Commercial Guaranties in Texas: Vanishing Limitations, Remaining Questions,* 12 Texas Tech.L.Rev. 785 (1981).

ance on the price of $5.1 million. Even then, plaintiff might not be entitled to replevin, depending upon claims made by the seller under the contract provisions for compensation in excess of that figure. I note also under the contract that if the exact figure is not agreed upon by the parties, it is to be settled by arbitration. In any event, it appears to me that replevin cannot be had at this time," and by order entered January 11, 1983:

"THE ABOVE MATTER coming before the Court on the Motion of the Plaintiff for Writ of Replevin, and the Court having reviewed the Affidavit filed herein, and the Stipulation of parties, and having heard arguments of counsel and received Briefs and argument in support of and in opposition to said application finds generally in favor of the Defendants.

"IT IS THEREFORE ORDERED that the Motion for Writ of Replevin be and the same is hereby denied." [9]

The issue of contract breach seemingly disappeared from the litigation with the described orders and after the reference to arbitration and determination that a balance remained due sufficient to reject any contention of contractual breach for nondelivery, except the retained assumption now present without factual justification in this remaining proceeding. No breach-of-damage instruction was given in this trial, but that omission is not presented here as separate error.

In addressing the substantive legal issues, and without a separate review of the hundreds if not thousands of intentional-interference cases, no case is found involving similar participants and factors.

Eight Wyoming cases include varied factual situations, all completely removed from the suretyship transaction existent here. *Spurlock v. Ely*, Wyo., 707 P.2d 188 (1985), a school-employee case, was decided adversely to plaintiff on a failure to prove causation for any contractual breach by the district. Earlier, in *Dehnert v. Arrow*

*Sprinklers, Inc.*, Wyo., 705 P.2d 846 (1985), this court in customary fashion addressed the factors of intentional interference; the case devolved into a question of malice or bad faith, in conflict between the majority and dissent, and did not address a relationship such as suretyship which is existent here.

*Martin v. Wing*, Wyo., 667 P.2d 1159 (1983), involved a real-estate transaction wherein an outsider slandered the property conditions and the court found that the outsider was without business interest in the transaction. The plaintiff was also successful in *Basin Electric Power Cooperative-Missouri Basin Power Project v. Howton*, Wyo., 603 P.2d 402 (1979), as a discharged employee of a subcontractor who alleged and convinced the jury that his termination was upon the instigation of the general contractor.

In *Kvenild v. Taylor*, Wyo., 594 P.2d 972 (1979), the court found that the intentional-interference claim did not apply, since the contractual dispute was between only two parties, and a like result was earlier found in *Board of Trustees of Weston County School District No. 1 v. Holso*, Wyo., 584 P.2d 1009, reh. denied 587 P.2d 203 (1978).

Two Wyoming cases with some general relevancy are *Allen v. Safeway Stores Incorporated*, Wyo., 699 P.2d 277 (1985), and *Wartensleben v. Willey*, Wyo., 415 P.2d 613 (1966). In *Allen*, summary judgment had been granted, and then affirmed on appeal. The plaintiff employees were discharged for uncomplimentary comments to a state food program inspector, which comments had been communicated by the inspector to the employer. The court analyzed the restatement provision and emphasized the word "improperly" in determining that a proper business purpose existed for the activity pursued, "One who intentionally and *improperly* interferes."

In *Wartensleben*, the defendant and his attorney contested a proposed feedlot oper-

---

**9.** Thereafter plaintiff's attorney removed the sitting trial judge, and substitution of other judges ensued.

ation. The trial court ruled against the plaintiffs in determining that they did not use illegal means, make false material representations, or resort to fraud or intimidation, and exercised what they believed to be their legal rights in good faith. The appellate court concurred.

Wyoming follows the four-factor rule generally representative of the position adopted in the Restatement of Torts § 770:

"We have recognized in prior cases the tort of intentional interference with contractual relations and have identified the following elements of such action:

"(1) the existence of a valid contractual relationship;

"(2) knowledge of the contractual relationship on the part of the interferor;

"(3) intentional and improper interference *inducing or otherwise causing a breach or termination* of the relationship; and

"(4) resultant damage to the party whose relationship has been disrupted." (Emphasis added.) *Dehnert v. Arrow Sprinklers, Inc.*, supra, 705 P.2d at 850,

and has adopted the Restatement of Torts § 773 defense:

"On the subject of justification, it is set out in 4 Restatement, Torts, § 773, p. 87 (1939), that:

"One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction." *Wartensleben v. Willey*, supra, 415 P.2d at 614.

See also Annot., 26 A.L.R.2d 1227; Annot., 84 A.L.R. 43.

California follows a five-part test:

"Under California law, inducing breach of contract is a tort with five basic elements:

" '(1) that a valid contract existed between the plaintiff and another party; (2) that the defendant had knowledge of the contract and intended to induce a breach thereof; (3) that the contract was breached; (4) as a proximate result of the defendant's wrongful or unjustified [unprivileged] conduct; (5) resulting in damage to the plaintiff. [Citations.]' *Abrams & Fox, Inc. v. Briney* (1974), 39 Cal.App.3d 604, 608, 114 Cal.Rptr. 328, 331." *International Wood Processors v. Power Dry, Inc.*, 593 F.Supp. 710, 729 (D.S.C.1984), aff'd 792 F.2d 416 (4th Cir.1986).

The Colorado rule is similar. *Comtrol, Inc. v. Mountain States Telephone and Telegraph Company*, 32 Colo.App. 384, 513 P.2d 1082 (1973).

The Missouri rule is stated differently:

"(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

"(2) Defendant's knowledge of the contract or relationship;

"(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

"(4) The absence of justification;

"(5) Damages resulting from defendant's conduct." *Institutional Food Marketing Associates, Ltd. v. Golden State Strawberries, Inc.*, 587 F.Supp. 1105, 1111 (E.D.Mo.1983), aff'd 747 F.2d 448 (8th Cir.1984).

Washington follows the four-point test similar to the Wyoming delineation. *Calbom v. Knudtzon*, 65 Wash.2d 157, 396 P.2d 148 (1964).

A significant number of cases from those jurisdictions support the position taken here.

Without particularizing Wyoming precedent as noted, except for the general principles which follow the Restatement, we would consider the disabilities of the judgment in this case without the factual issue questions.

(1) Guarantor's request that security be obtained is not wrongful. See *Allen v.*

*Safeway Stores Incorporated,* supra; *Quinlivan v. Brown Oil Co.,* 96 Mont. 147, 29 P.2d 374 (1934); *Ford v. C.E. Wilson & Co., Inc.,* 129 F.2d 614 (2d Cir.1942); *Knapp v. Penfield,* 143 Misc. 132, 256 N.Y.S. 41 (1932); *Braden v. Perkins,* 174 Misc. 885, 22 N.Y.S.2d 144 (1940).

(2) No contract breach occurred involving conduct of the guarantor.

(3) Under Restatement of Torts § 773, the guarantor has a defense by virtue of the interest as a debtor in the transaction.

(4) Damage was lacking in the absence of a specific concurrent release agreement by the manufacturer. The conduct did not create the unlawful tort.

### (1) *Improper or Wrongful Interference*

The only case found of a somewhat similar nature is *Ethyl Corporation v. Balter,* Fla.App., 386 So.2d 1220 (1980), cert. denied 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). Ethyl Corporation was a guarantor, and upon default satisfied the indebtedness by payment to the lender. Certain subrogation efforts followed, and later transactions pursued by the borrower did not satisfactorily develop. Ethyl Corporation ultimately was sued for contractual interference for trying to maintain protection for its guaranty payment.

Giving several reasons for the verdict reversal, the court said:

"There is, moreover, a completely separate, additional, and overriding reason which precludes Ethyl's liability for 'interference' with any of the various contracts and relationships cited by Balter. Ethyl was, as a matter of law, privileged to act as it did throughout the entire course of events involved in this case. At all times, its actions were reasonably directed to the recovery of the very substantial sums it was owed by Pac-Craft, to the protection of its status as the co-obligor with the corporation on a $450,000 loan it was later required to pay, and, finally, as the lawful holder of 100% of its stock." 386 So.2d 1224–1225.

In *Ford v. C.E. Wilson & Co., Inc.,* supra, the Bank exercised its security position and intentional interference was denied as to third-party creditor claimants: "* * * In addition to all this the Bank had a privilege to interfere with the plaintiff's contracts and expectancies because it was 'acting under an equal or a superior right' when seeking security for its own advances." 129 F.2d at 617. See also *Feeley v. McAuliffe,* 335 Ill.App. 99, 80 N.E.2d 373 (1948).

For similar results in nonsuretyship cases, see *Conoco Inc. v. Inman Oil Company, Inc.,* 774 F.2d 895 (8th Cir.1985) (oil sales bidding); *Landess v. Borden, Inc.,* 667 F.2d 628 (7th Cir.1981) (milk delivery contract); *International Wood Processors v. Power Dry, Inc.,* supra, 593 F.Supp. 710 (no prima facie evidence of abuse of justification in food marketing controversy); *Martin v. Texaco, Inc.,* supra, 304 F.Supp. 498 (filling station leases and gasoline sales business); *Geofreeze Corp. v. Hannah Construction Co.,* 588 F.Supp. 1341 (E.D. Pa.1984) (withholding progress payments on construction contract); *Bledsoe v. Watson,* 30 Cal.App.3d 105, 106 Cal.Rptr. 197 (1973) (letter to government body about attorney's fees); *Bergfeld v. Stork,* 7 Ill. App.3d 486, 288 N.E.2d 15 (1972) (lease reservation); *Quinliven v. Brown Oil Co., Inc.,* supra; *Donald G. Culp Co. v. Reliable Stores Corp.,* 14 Ohio App.3d 161, 470 N.E.2d 193 (1983) (exercising control on store sublease); *Pearse v. McDonald's Systems of Ohio, Inc.,* 1 Ohio Op.3d 164, 47 Ohio App.2d 20, 351 N.E.2d 788 (1975) (valid business interest in employee managerial training); *Wahl v. Strous,* 344 Pa. 402, 25 A.2d 820 (1942) (attorney's fees, invalid contract); *Hunt v. Coastal States Gas Producing Co.,* Tex.Civ.App., 570 S.W.2d 503 (1978), aff'd 583 S.W.2d 322, cert. denied 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979), reh. denied 444 U.S. 1103, 100 S.Ct. 1071, 62 L.Ed.2d 790 (1980) (oil purchase after naturalization); *Black Lake Pipe Line Co. v. Union Construction Co., Inc.,* Tex., 538 S.W.2d 80 (1976), (recovery rejected on requiring additional crews for

pipeline construction); *Davis v. Lewis*, Tex. Civ.App., 487 S.W.2d 411 (1972) (auto repair finance company shop direction controversy). See also *Sakowitz, Inc. v. Steck*, Tex., 669 S.W.2d 105 (1984) (enforcement of noncompetition employment agreement); *Calbom v. Knudtzon*, supra (attorney's fees).

Factual determinations resulting in a successful attack as an intentional-interference claim are illustrated in *Alyeska Pipeline Service Co. v. Aurora Air Service, Inc.*, Alaska, 604 P.2d 1090 (1979) (sub-sub terminated and bad faith and ill will of general alleged creating issue of fact); *Bridges v. Cal-Pacific Leasing Co.*, 16 Cal. App.3d 118, 93 Cal.Rptr. 796 (1971) (complex real estate transaction, advice to third party not to make payments, inference could support lack of justification); *Kozlowsky v. Westminster National Bank*, 6 Cal.App.3d 593, 86 Cal.Rptr. 52 (1970) (officer discharge); *McEnroe v. Morgan*, 106 Idaho 326, 678 P.2d 595 (1984) (justification for real estate transaction, involvement unproved); *Barlow v. International Harvester Company*, 95 Idaho 881, 522 P.2d 1102 (1974) (slander involvement in guaranty disturbance); *P & F Industries v. Medallion Group, Inc.*, 102 A.D.2d 865, 476 N.Y.S.2d 928 (1984) (caused diversion of trust funds); *Scymanski v. Dufault*, 80 Wash.2d 77, 491 P.2d 1050 (1971) (co-op marketing conflict).

None of the cases involving a successful appeal for intentional-interference claims had to do with principles or factual situations affording authority to support the decision of this court or a rule permitting recovery in this guaranty situation.

The intrinsic status of the guaranty relationship as an aspect of the field of suretyship must consequently explore the claimed legitimacy of the business relationship of a guarantor requesting security protection upon note renewal.

"Suretyship may be defined as a contractual relation whereby one person engages to be answerable for the debt or default of another." Stearns, Law of Suretyship, supra, § 1.1 at 1.

"At common law, where the creditor received security from the principal for the payment of the debt, the surety could not force the creditor to look first to such security for his payment. The surety could protect himself by paying the creditor and thereby becoming subrogated to the creditor's rights in the security." Id., § 7.22 at 237.

"Subrogation in suretyship is 'a mode which equity adopts to compel the ultimate discharge of the debt by him who in good conscience ought to pay it, and to relieve him whom none but the creditor could ask to pay.' The scope of the right of subrogation consists in the immediate transfer, by operation of law, to the promisor in suretyship of all the rights of the creditor against the principal whenever the promisor pays the debt or satisfies the obligation. This right of subrogation is independent of any agreement between the parties and rests upon principles of natural justice and equity." Id., § 11.1 at 439.

"The third great equitable right of a surety is his right, on payment of the principal's debt, to be indemnified by the principal for the loss sustained by the surety in making payment of the debt. This right sometimes also described as a right to reimbursement or exoneration, is universally recognized." Id., § 11.35 at 505.

See also Alces, *The Efficacy of Guaranty Contracts in Sophisticated Commercial Transactions*, 61 N.C.L.Rev. 644 (1983).

These principles seem clearly identified and established without significant question, evolving from suretyship, and earliest noted in Greek and Roman literature. See Pingrey on Suretyship and Guaranty (2d ed. 1913); I Brandt, Suretyship & Guaranty (3d ed. 1905); Loyd, *The Surety*, 66 U.Pa.L.Rev. 40 (1917-18).

Two Wyoming statutes have bearing on suretyship aspects and are applicable here.

The guarantor has the status under application of the Uniform Commercial Code as a debtor. See § 34-21-905, W.S.1977, 1986 Cum.Supp. (U.C.C. § 9-105(1)(d)).

*Rushton v. Shea,* 423 F.Supp. 468 (D.Del. 1976); *Norton v. National Bank of Commerce of Pine Bluff,* 240 Ark. 131, 398 S.W.2d 538 (1966); *Barnett v. Barnett Bank of Jacksonville,* Fla.App., 345 So.2d 804 (1977); *Bank of Gering v. Glover,* 192 Neb. 575, 223 N.W.2d 56 (1974); *T & W Ice Cream, Inc. v. Carriage Barn, Inc.,* 107 N.J.Super. 328, 258 A.2d 162 (1969); *Chase Manhattan Bank, N.A. v. Natarelli,* 93 Misc.2d 78, 401 N.Y.S.2d 404 (1977); *Zions First Nat'l Bank v. Hurst,* Utah, 570 P.2d 1031 (1977); Note, *The Waiver of Defenses By Guarantors In Guaranty Contracts and the Nonwaiver Provisions of the Uniform Commercial Code,* 5 Vermont L.Rev. 73, 84 n. 3 (1980).

Additionally, § 34–21–963, W.S.1977, 1986 Cum.Supp. (U.C.C. § 9–504), provides:

"(e) A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this article."

See Nickles, *Rethinking Some U.C.C. Article 9 Problems—Subrogation; Equitable Liens; Actual Knowledge; Waiver of Security Interests; Secured Party Liability for Conversion Under Part 5,* 34 Ark.L. Rev. 10, 12 (1980–81); Hollabaugh, *Surety's Right to Equitable Subrogation: Overture for an Arrow,* 51 Ins.Counsel J. 547 (1984).

No more realistic business decision from the standpoint of a guarantor can be found than for him to consider and request that the lender get any collateral available when the note renewal occurred in March, 1982. Thereafter, arbitration determined that in fact an unpaid balance remained on the contracts, which validated the release denial by the principal, the lender and the guarantor.

Not a scintilla of evidence of an improper business purpose is demonstrated by the guaranty history and the lending transaction. Intimation and contention by testimony, obviously persuasive to the listening jury, to suggest that Fitzgerald might have some control or interest in *Oil Patch* in no way affects the legal result and, in fact, relevant case law would find a strengthened self-interest factor justifying his separate protection if he had in fact been the sole stockholder and guarantor for the corporate manufacturer. *Petit v. Cuneo,* 290 Ill.App. 16, 7 N.E.2d 774 (1937). See also *Coronet Development Company v. F.S.W., Inc.,* 379 Mich. 302, 150 N.W.2d 809 (1967).

### (2) Contractual Breach

The assumptive posture of Texas West appears to be that somehow a contractual breach existed for which the consequent liability of Fitzgerald could be asserted.[10] It is axiomatic in contractual cases of this nature that a valid contract does exist and a breach is required for resulting liability. *Denhert v. Arrow Sprinklers, Inc.,* supra, 705 P.2d 846; *Bellefonte Underwriters Insurance Co. v. Brown,* Tex., 663 S.W.2d 562 (1983), rev'd on other grounds 704 S.W.2d 742 (1986). See also Restatement of Torts § 766.

The question of the failure of timely completion, if factually existent as a breach, was not in any way proximately related to Fitzgerald and if contended could have nothing to do with interference liability. See *Spurlock v. Ely,* supra, 707 P.2d 188; *Worldwide Commerce, Inc. v. Fruehauf Corp.,* 84 Cal.App.3d 803, 149 Cal. Rptr. 42 (1978).

---

**10.** Another interesting anomaly exists with the three co-guarantors. One of the other two, Gordon Gibson, signed the renewal note and the financing agreement with the approval of the other guarantor, W.T. Harries (these two being the shareholders and officers of Oil Patch). Suit was originally instituted on the intentional interference claim against only the outside guarantor, and not the parties with control of Oil Patch. An attempt during trial to add the Bank and Gibson was denied by the trial court, and another lawsuit is now pending in this court on that litigation.

The breach of contract then remaining for contention would be nondelivery, and that issue must be evaluated both in consonance of the contractual provision "delivery upon payment," and § 34–21–259, W.S. 1977, providing that delivery is due upon payment, which accords with the contractual provision between the parties. The real world must be recognized in that the contract balance decided upon in arbitration removed any question from the later convened jury of contractual breach by nondelivery, since the right to nondelivery was then otherwise determined as the law of the case where demand for delivery was not accompanied by tendered requested payment. Likewise, the original trial court recognized this status by the quoted letter opinion and order denying replevin when the litigation had first been instituted.

Note must also be made that Fitzgerald only claimed right of possession after payment of the guaranty and consequent assignment of the collateral rights to him by the lender. At that time he became the secured lender. This event, as earlier noted, by stipulation *was not* the interference causative factor.

### (3) *Interest of Party To be Charged With Claimed Interference*

In accord with the Restatement of Torts provision, § 773, it is hard to define a more specific interest in the asset value remaining due to the manufacturer than that held by Fitzgerald when the guaranteed indebtedness without payment matured into default and was then called by the lender for guarantor payment. *Zoby v. American Fidelity Company,* 242 F.2d 76 (4th Cir.1957) ("economic interest that is substantial"); *Sakowitz, Inc. v. Steck,* supra, 669 S.W.2d 105.

Legalistically, the position of Texas West and the resulting jury verdict after appropriate summary-judgment motions creates an amorphous, malicious-prosecution concept denying the right of the surety turned lender after call to contest and claim for collateral rights to the delinquent borrower's assets. This theory is not only not within the province of any operational func-

tion of intentional interference but is also directly proscribed by the provisions of Restatement of Torts, §§ 773 and 769. *Singer Credit Corporation v. Mercer Island Masonry, Inc.,* 13 Wash.App. 877, 538 P.2d 544 (1975); *Matter of Kearney Chemicals, Inc.,* 468 F.Supp. 1107 (D.Del.1979); *Babson Bros. Co. v. Allison,* Fla.App., 337 So.2d 848 (1976), cert. denied 348 So.2d 944 (1977).

> "* * * One who in good faith asserts a legally protected interest of his own which he believes may be impaired by the performance of a proposed transaction is not guilty of tortious interference." *Singer Credit Corporation v. Mercer Island Masonry, Inc.,* supra, 538 P.2d at 549.

Significant also is the fact that the collateral security documents did not change the relationship between Oil Patch and Texas West, since the collateral assignment encumbering inventory and receivables could and did only encumber a receivable. If Texas West owed nothing, it was entitled to rig possession, and the collateral assignment afforded no interest in the rig. The collateral pledge in no way changed title status. If money was due and Oil Patch had a right to payment, likewise nothing was changed except the right of the lender or subordinated guarantor to receive that money upon payment of whatever amount remained due as derived from the contractual relationship between the manufacturer and buyer. *Tidal Western Oil Corp. v. Shackelford,* Tex.Civ.App., 297 S.W. 279 (1927).

### (4) *Damage*

Assumptive for determination of damage is the basic question of how anything Fitzgerald did adversely affected the legal relationships determined by the arbitration award.

To contend for liability and consequent damages, it is required to determine as a principle of business law that Fitzgerald, some time before his guaranty payment, should have forced the seller to release the equipment to the buyer with two direct and divisive results. First, the significant asset

would be gone from which funds for repayment to the guarantor could have been expected, and for which the rights of the principal to avoid indemnification would have been lost. Secondly, if Fitzgerald makes demand on the borrower to release the collateral security, then the borrower has the right to claim an offset for the value against any debt due either by instrument assignment or subrogated right of indemnity.

No matter what construction of California, New York, Oregon, or Restatement rules may be utilized for the tort, this transaction was not appropriate to justify the verdict for $500,000, $4,000,000, or whatever later may be determined by the jury as a figure that suits their conclusion, as witnessed by a Texas jury in *Texaco Inc. v. Pennzoil Company,* 784 F.2d 1133 (2d Cir.1986), an interference case which exceeded $11 billion.

Clearly, some elucidation should now be afforded by this court detailing what breach of duty devolved against the guarantor and what resulting compensation is justified therefrom. See Prosser and Keaton on Torts at 1004 (5th ed.)

It is not with idle contemplation that the concern about the measure of damages is addressed. Where today none of the participants really want the stacked drilling rig, one is called to envision a morass without safety rope into which the trial court will be thrust in an effort to instruct the next jury as to their authority and responsibility. Texas West owes Fitzgerald the sum of $467,000, plus interest and attorney's fees totaling $678,387.17 as of March 13, 1985, and statutory ten percent interest since that date. On payment, Texas West should be entitled to the drilling rig, which apparently the parties now value at about $250,000.[11]

Against the amounts presently creditable as a debt determined due, there would then be the damages to be derived from a jury determination of the contractual default in-

stigated by Fitzgerald for which loss was sustained by Texas West. Unfortunately, in the present juncture of this case, the trial court is left to speculate as to the contractual default which constitutes the fact from which damages might subsequently be proved by the evidence and assessed by the jury. This is a complex requirement, since, in my opinion, no contract default has been proved.

Since the majority is determined to reverse the trial court, excise the remittitur and reactivate a further jury for the determination of damages, the court should determine the event of contract default and the measure of damages in order to provide some rational expectancy that this litigation pursued since 1982 will be seasonably terminated without the probability of another jury trial followed by another appeal. *Gulf Colorado and Santa Fe Ry. v. Deen,* Tex.Civ.App., 306 S.W.2d 171 (1957), rev'd and remanded 158 Tex. 466, 312 S.W.2d 933, mandamus granted in *Deen v. Hickman,* 358 U.S. 57, 79 S.Ct. 1, 3 L.Ed.2d 28, cert. denied in *Deen v. Gulf, Colorado & Santa Fe Ry. Co.,* 358 U.S. 874, 79 S.Ct. 111, 3 L.Ed.2d 105 (1958).

I would affirm the decision of the trial court on the arbitration, and would also reverse the trial court and direct the entry of a judgment in favor of defendant Fitzgerald on the plaintiff's counterclaim against the intervenor, with the expectancy that possibly the litigation without further investment in cost to all parties would now be concluded. I would agree with the court that neither the original jury award nor the reduced amount by remittitur was proven as a proper damage award. See majority and dissenting opinions in *Petty-Ray Geophysical, Division of Geosource, Inc. v. Ludvik,* Wyo., 718 P.2d 9 (1986).

arbitration award, which amount has been assigned to and is collectible by Fitzgerald.

---

11. The determination of amounts due Fitzgerald is derived from the judgment entered in favor of Oil Patch against Texas West, pursuant to the