DONALD G. CULP COMPANY ET AL.,
APPELLEES, *v.* RELIABLE STORES
CORP. ET AL., APPELLANTS.

(No. 82AP-544—Decided
December 22, 1983.)

*Messrs. Baker & Hostetler* and *Mr. Daniel J. Gunsett,* for appellees.

*Messrs. Folkerth, Webster, Maurer & O'Brien* and *Mr. Glenn B. Redick,* for appellant Swarb Realty Co.

*Krupman & Bownas Co., L.P.A.,* and *Mr. Victor S. Krupman,* for appellant Reliable Stores Corp.

MOYER, J. This case is before us on the appeal of defendants-appellants, Reliable Stores Corporation ("Reliable") and Swarb Realty Company ("Swarb"), from a judgment of the Court of Common Pleas of Franklin County rendered in favor of plaintiffs-appellees, Donald G. Culp Company ("Culp") and Hadler Realty Company ("Hadler"), on their claim for real estate commissions.

The testimony and exhibits show that Swarb leased a building in downtown Columbus to Reliable in 1972. The lease was for a period of ten years with options to renew for two additional seven-year terms. The lease also provided that Reliable could not sublet the premises without obtaining Swarb's consent and that Swarb's consent would not be unreasonably withheld.

In 1979, Reliable, which had been using the premises as a jewelry store, decided to close the store and offered to give Swarb early possession of the property. When Swarb rejected Reliable's offer, Reliable sought the aid of Culp, a commercial real estate broker, in procuring a subtenant for the two and one-half years remaining on the lease.

After Mr. Culp reviewed the lease, he wrote to Reliable and suggested listing the property at a rental of $5,000 per month. Culp enclosed an exclusive listing agreement with his October 24, 1979 letter and Reliable signed the listing agreement on November 9, 1979. The listing agreement covered the period from November 9, 1979 to July 8, 1980, and provided that it would continue in effect thereafter until canceled by Reliable or Culp. Swarb, the owner of the property, received notice of the exclusive listing agreement between Reliable and Culp on November 15, 1979.

During the spring of 1980, Big Bite, Inc., a fast-food restaurant, offered, through Culp, to sublease the premises from Reliable. Swarb, Reliable and Culp were all involved in the Big Bite negotiations until they terminated in early May of 1980.

Meanwhile, Reliable wrote to Swarb on March 25, 1980 and again offered to

terminate the lease and give Swarb early possession of the property.

On April 7, 1980, Don Feibel, a realtor whose offices were in the same building as Swarb's and whose father, Troy Feibel, was Swarb's attorney, received a call from White Castle Systems, Inc. ("White Castle"), another fast-food restaurant, which was interested in acquiring a downtown location. Don Feibel called Raymond Kahn, the president of Swarb, to inform him of White Castle's interest.

On April 14, 1980, another real estate broker, Paul Howald, who eventually provided information about the building to Don Feibel who relayed it to White Castle, called Kahn and asked whether he should contact Reliable and Culp about the property. Kahn told Howald not to contact Culp or Reliable.

On April 15, 1980, Kahn, Don Feibel and two other people showed a group of people from White Castle through the premises.

Then, on May 1, 1980, Sam Jackson, Jr., for himself and a corporation to be formed, submitted to Culp an offer to sublease the premises. The same day, Culp forwarded the Jackson proposal to Reliable and urged Reliable to accept it. Jackson also wanted to use the premises for a restaurant. Swarb learned of the Jackson offer on May 6, 1980.

On May 8, 1980, Kahn met with Troy Feibel, Swarb's attorney, and Don Feibel, White Castle's real estate broker, to draft a response to Reliable's offer to terminate the lease. In its response, which was sent to Reliable on May 9, 1980, Swarb offered to cancel the lease with Reliable, or to split the profits which would accrue on the Jackson sublease since Jackson's rent would exceed the rent being paid by Reliable.

Within the next week, the Jackson offer expired, Howald called Kahn to let him know he was still interested in the property, Reliable's attorney sent Reliable her revisions of the Jackson proposal, and one of Don Feibel's employees took White Castle's engineers through the building.

After Reliable sent its revisions of the Jackson proposal to Culp, White Castle, through its broker, presented to Swarb an offer to sublease the premises. This offer was not accepted; however, White Castle's second offer to sublease, which was made contingent upon Swarb's release from its lease with Reliable, was accepted by Swarb on June 3, 1980.

On June 12, 1980, Reliable sent the revised Jackson proposal and Jackson's financial statement and credit report, which had been requested by Swarb, to Swarb, and asked for Swarb's consent to the Jackson sublease.

Kahn discussed the Jackson proposal with Troy Feibel and Don Feibel on June 19, 1980, and then requested, by letter, that Reliable provide him with plans for Jackson's proposed alterations to the building and that a bond guaranteeing restoration of the premises be provided. Reliable forwarded this letter to Culp on June 26.

On July 1, 1980, Mr. Culp called Troy Feibel and questioned the reasonableness of the request for a restoration bond. During the next two weeks, Troy Feibel, Culp, Hadler (Jackson's broker who was to split the commission with Culp), Reliable and Jackson's architect held various meeting and telephone conversations and exchanged correspondence in an attempt to satisfy Swarb's concerns and to reach an agreement to sublease the property to Jackson. At a July 8 meeting between Culp and Troy Feibel, Culp was assured by Feibel that there was no reason to provide a restoration bond. Then, on July 11, 1980, in the midst of these ongoing negotiations, Swarb and Reliable apparently reached an agreement to terminate their lease. A July 11, 1980 letter from Reliable to Swarb confirmed Reliable's understanding of their agree-

ment. At this point, Swarb and Reliable had not yet agreed which of them would be liable for Culp's commission; but all of the terms of their agreement to cancel were agreed to at the latest by July 20, 1980, and a cancellation agreement was signed by both Reliable and Swarb on July 28, 1980.

Although the original term of Culp's exclusive listing agreement expired July 8, 1980, since the agreement continued until it was canceled by Culp or Reliable, Reliable wrote to Culp and canceled the listing agreement on July 22, 1980.

The lease between White Castle and Swarb was signed on July 28, 1980.

Swarb and Reliable both denied responsibility for Culp's commission and the trial court found them jointly and severally liable to Culp and Hadler in the amount of $51,840.

Swarb raises the following four assignments of error in support of its appeal from that judgment:

"1. The judgment rendered by the trial court is against the manifest weight of the evidence.

"2. The trial court erred in finding that Swarb Realty had tortiously interfered with the business relationship between Donald G. Culp Company and Reliable Stores.

"3. The trial court erred in finding that Swarb Realty Company failed to have a privilege when interacting with Reliable Stores.

"4. The trial court erred in finding that the acts of Swarb Realty were a proximate cause of the final sublease failing to be signed between Reliable Stores and Sam Jackson."

Swarb's four assignments of error all concern the trial court's finding that Swarb, without being privileged to do so, tortiously interfered with the contractual relationship between Reliable and Culp.

The applicable law is found in 4 Restatement of the Law 2d, Torts (1979) 7, 17, 26-27, 52, Sections 766, 766A, 767, 773. Sections 766 and 766A provide that one who intentionally and improperly interferes with the performance of a contract between two other persons is liable for the pecuniary loss resulting to one of the other two persons as a result of the wrongful interference with their contract. See, also, *Ross* v. *Woyan* (1980), 1 Ohio App. 3d 39, 40; *Pearse* v. *McDonald's Systems of Ohio, Inc.* (1975), 47 Ohio App. 2d 20, 22-23 [1 O.O.3d 164].

However, Section 773 of the Restatement contains an exception to the general rule. As this court held, in *Pearse, supra,* at 25:

"Pursuant to the provisions of Section 773, IV Restatement of Torts * * * one is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract. * * *"

In the present case, Kahn and Troy Feibel testified that, since the property had been used for years for retail purposes, Swarb wished to insure that, if the property was transformed into a restaurant, the tenant would return the property at the end of the lease in its original condition and ready to be used again for retail sales. Troy Feibel also expressed concern that a new sign would damage the marble on the front of the building.

Culp argues that, since Swarb had not required a bond from Reliable and since Swarb leased the premises to White Castle without a bond, the demand for a bond was merely a delaying tactic and was not designed to protect a legitimate business interest. Indeed, Swarb's signing of a contract with White Castle and Troy Feibel's admitted strong preference for White Castle as a lessee can be used to assign an unstated motive to Swarb's insistence that either Reliable or Jackson agree to a restora-

tion bond. However, the following evidence supports the only reasonable conclusion that could have been made with respect to this issue: evidence that Reliable used the property as a retail store, not as a restaurant, therefore obviating the need for a restoration bond; Don Feibel's testimony that there had been discussion regarding requiring White Castle to provide a bond because Kahn was concerned about their stability; Troy Feibel's testimony that White Castle was one of the most debt-free and solid companies in the United States and that its many years of operation allowed him to assess its financial trustworthiness; evidence that Jackson intended to use the premises as a restaurant to be leased by a corporation that was "to be formed"; Troy Feibel's testimony that the standard form of a lease that he prepares provides that, if a tenant makes repairs to a building, the tenant must provide a bond, and Troy Feibel's reference to a specific lease in which such a requirement is included; Troy Feibel's testimony that "[w]e told Reliable that if they wanted to put up a bond for restoration, they would have carte blanche to sublease, that's all we were interested in"; the undisputed testimony of Troy Feibel that he never received the information he had requested regarding the cost of returning the premises to its original suitability for use as a retail store so he could compute the amount of the bond; the absence of any testimony, except for the statement of Culp that he had never seen such a requirement and the statement of Coplan, the president of Reliable, that it was unreasonable, indicating that the bond requirement was unreasonable or that the undetermined amount of the bond would be unreasonable; Kahn's testimony that, if Reliable or Culp had given Swarb a bond in writing, Swarb would have considered leasing to Jackson; and Troy Feibel's testimony that the bond was necessary, even though Reliable would remain on the lease, in case Reliable was sold to outside interests who would not be as dependable as Reliable had been.

The only reasonable conclusion to be drawn from the facts in this case is that Swarb's refusal to consent unless a restoration bond was provided was reasonably designed to protect Swarb's legitimate interest in the property. Under the circumstances, the trial court erred in finding that the demand for a restoration bond was unreasonable and that Swarb's actions were not privileged.

Furthermore, Swarb's refusal to consent to the sublease without a bond was not the proximate cause of Culp's failure to finalize the Jackson sublease. Reliable's failure to relay Swarb's demand for a bond to Culp so that Culp could ask Jackson to comply, discussed *infra*, was the proximate cause of the failure to finalize the sublease.

Accordingly, Swarb's four assignments of error are sustained.

Reliable raises the following seven assignments of error in support of its appeal:

"(A) The Court of Common Pleas erred in finding as its conclusion of law, paragraph 4, that (a) Reliable breached an express term of the listing agreement by failing to cooperate in any manner possible in order to effectuate a sublease of the premises and (b) specifically by failing to exercise its legal right to compel Swarb to consent to a sublease where no reasonable grounds existed for refusal to consent and (c) by agreeing to a cancellation of its lease during the pendency of a valid sublease proposal and during the term of the listing agreement. * * * In conjunction herewith the Court of Common Pleas erred in its finding of fact number 47 where it concluded that Reliable failed to use its best efforts to effectuate a sublease of the premises to Sam Jackson, Jr.

"(B) The Court of Common Pleas

was in error when it concluded at law that Culp's obligation to Reliable under the listing agreement was to procure a ready, willing and able subtenant acceptable to Reliable, and to place Reliable in a position to enter into a sublease with that proposed subtenant.

"(C) The Court of Common Pleas erred in concluding (Conclusion 2) that Culp performed that obligation (stated in Conclusion 1) in the listing agreement by presenting Sam Jackson, Jr. as a potential subtenant for the property.

"(D) The Court of Common Pleas erred in concluding at paragraph 13 of its conclusions of law that the damages are equal to the amount of the commissions Culp would have earned had the Jackson sublease proposed [*sic*] been executed.

"(E) The Court of Common Pleas erred in its conclusion of law paragraph 3 wherein it ruled Reliable was obligated by law to assume the risk of obtaining Swarb's approval to any sublease proposed by a ready, willing and able subtenant produced by Culp.

"(F) The Court of Common Pleas erred in its conclusion of law paragraph 5 wherein it ruled Reliable breached an implied condition of the listing agreement by cancelling its lease with Swarb during the term of the listing agreement, thus making it impossible to meet the condition set forth in the sales agreement that Culp's commission be paid upon signing a final contract.

"(G) The Court of Common Pleas erred in its conclusion of law number 6 in finding Culp earned a commission under the express term of the letter of October 24, 1979, which was an integrated part of the listing agreement, by virtue of Reliable's cancellation of its lease with Swarb during the term of the listing agreement, and Swarb's subsequent leasing of the property to a new tenant."

Since Reliable's Assignments of Error A, B, C, E, F and G all deal with Reliable's and Culp's obligations to each other and with whether they fulfilled or breached those obligations, these six assignments of error will be considered together.

Reliable's basic argument supporting Assignments of Error A, E and F is that Reliable did not breach the terms of its listing agreement with Culp.[1] Reliable's basic argument underlying its Assignments of Error B, C and G is that Culp did not fulfill his obligations under the listing agreement and was not entitled to a commission.

The basic flaw in Reliable's arguments is that Reliable overlooks the fact that Reliable prevented Culp from obtaining Swarb's consent to the Jackson proposal. Although Culp had been informed, in late June or early July, that Swarb would not consent to the sublease unless a bond guaranteeing restoration of the building to a retail store was provided, Culp was informed, on July 8, 1980, by Troy Feibel, that there was no reason for Jackson to provide a bond and that Troy Feibel saw no problem with Jackson as a subtenant. Troy Feibel also requested architectural plans and some additional information regarding the Jackson proposal.

On July 8, immediately following this meeting, Culp wrote to Reliable and informed Reliable that Swarb would apparently drop the bond requirement. Culp also contacted Jackson's architect to assure that the other information requested by Troy Feibel, on behalf of Swarb, was provided to Swarb. We find no evidence in the transcript or the ex-

---

[1] Although Reliable separately assigns almost every one of the trial court's findings as error, since we hold that the trial court's major finding that Reliable failed to cooperate with Culp is correct, we deem it unnecessary to separately discuss each of the trial court's findings of fact.

hibits indicating that Culp was advised after July 8 that a restoration bond would be required. Thus, following the July 8 meeting, Culp had no reason to believe that Swarb would still require a bond. Culp was led to believe at that meeting, which Reliable did not attend, that the Jackson proposal would be accepted by Swarb.

After Reliable received Culp's letter manifesting Culp's belief that Swarb had dropped the bond requirement, Coplan (Reliable's president) was informed by Troy Feibel that serious questions remained as to the Jackson sublease. Although the bond was discussed in that conversation, Reliable took the position that the bond requirement was totally unreasonable and that Reliable, having orally guaranteed restoration, would not provide a bond. However, Reliable failed to inform Culp that Swarb had apparently changed its mind about the bond or that Culp's belief that a bond would not be required was no longer correct. Reliable's unwavering contention throughout these negotiations that a bond was unreasonable is consistent with the evidence that Reliable did not inform Culp that the bond requirement had not been dropped and that Reliable did not enter into negotiations on the amount of a bond. Reliable did orally offer to be responsible for restoration of the premises, but it never agreed to pay for a bond or provide the information necessary for determining the amount of the bond as requested by Troy Feibel. Thus, insofar as the dispute between Culp and Reliable is concerned, it cannot be said that Culp failed to fulfill his obligation to see that Jackson provided a bond to satisfy Swarb and obtain Swarb's consent because no one informed Culp that a bond was once again a requirement to obtain Swarb's consent to the sublease.

The evidence supports the trial court's findings that Jackson was at all times ready, willing and financially able to enter into a sublease for the premises and that Culp fulfilled his obligations under the listing agreement.

Furthermore, although the listing agreement states that the commission is payable when the sublease is signed, this language does not support Reliable's contention that Culp was not yet entitled to his fee because that language does not state when the fee *accrues* or is *earned* — it merely states when the fee becomes *payable*.

The trial court's findings that Reliable failed to use its best efforts to effectuate a sublease and that Reliable failed to cooperate with Culp are also supported by the evidence. Reliable's Assignments of Error A, B, C, E, F and G are not well-taken and are overruled.

Reliable's Assignment of Error D asserts that the trial court erred in computing damages based on the commission Culp would have earned on the proposed Jackson sublease. The October 24, 1979 letter that is part of the listing agreement provides in part:

"If a new tenant is obtained, and the owner wishes to take this new tenant directly and simply cancel your lease; then, I would be entitled to a fee on the new lease * * *."

While "new lease" could mean the White Castle lease, the use of the word "obtained" seems to indicate that the parties contemplated a situation where the new tenant was obtained by Culp. Although the listing agreement is somewhat ambiguous, since the trial court's resolution of the issue regarding the meaning of the agreement is not erroneous, unreasonable or unsupported by the evidence, we decline to modify the trial court's conclusion that damages should be computed using the Jackson proposal. See *G. F. Business Equip., Inc.* v. *Liston* (1982), 7 Ohio App. 3d 223, 225-226.

Reliable also argues that the trial court's award of damages was erroneous since it failed to reduce the commissions for the two renewal terms, which commissions would not be earned

or payable until the options to renew were exercised, to their present value. When Mr. Culp presented the trial court with his calculation of the damages to which he was entitled, the court asked:

"THE COURT: Has anybody bothered to reduce this to present day value or does it get into the act at all?

"MR. KRUPMAN: It sure does.

"THE COURT: Is that what we are talking about?

"THE WITNESS [CULP]: Yes."

Thus, the trial court was led to believe that they were talking about present value, *i.e.*, that Culp's figures had been reduced to present value, and Reliable did not offer any evidence to the contrary.

Reliable's entire present value argument is based on a letter attached to its brief, which Reliable refers to as "Exhibit D," and "the letter of March 20." Although there is an Exhibit D in the record and there is a letter dated March 20, neither of these letters contain the quotations and information concerning present value that Reliable claims they contain. The letter to which Reliable refers is actually Appendix D to Reliable's brief. This letter was never introduced into evidence and Reliable's attempt to rely upon it now is a futile act, as our disposition of any appeal is confined to a review of the record of the trial court.

Since Reliable did not introduce any evidence rebutting Culp's computation, the trial court did not err in awarding damages based on the Jackson proposal and apparently based on Culp's calculations. Reliable's Assignment of Error D is overruled.

For the foregoing reasons, the judgment of the trial court is reversed as it relates to Swarb and affirmed as it relates to Reliable.

*Judgment affirmed in part and reversed in part.*

WHITESIDE, P.J., and NORRIS, J., concur.