**In the Matter of Robert P. GETTYS, Debtor.**

**Bankruptcy No. 95–11885.**

United States Bankruptcy Court, S.D. Ohio, Western Division.

Feb. 21, 1997.

John Woliver, Batavia, OH, for Claimant Lawrence R. Fisse.

Norman L. Slutsky, Cincinnati, OH, for Robert P. Gettys.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

J. VINCENT AUG, Jr., Bankruptcy Judge.

This matter is before the Court upon motions for summary judgment filed by the Debtor and Lawrence R. Fisse. (Docs. 26 and 29.) This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

### Facts

On September 25, 1990, Sharon Heim (Heim) was injured in an automobile accident. (Heim Dep. at 9, 72.) A few days afterward Heim hired attorney Lawrence R. Fisse (Fisse) to represent her with a claim for personal injuries she sustained in the automobile accident. (Heim Dep. at 9–10, 72, attached Pl.'s Ex. 2, *Contract for Contingent Fee Arrangements*.) Fisse had represented Heim in a 1978 divorce action. After the automobile accident, Heim also hired Fisse to represent her in a second divorce action and in preparing a pre-nuptial agreement. Heim and Fisse agreed that Fisse's fee for work on the personal injury claim, the second divorce action and the pre-nuptial agreement would be paid out of the money recovered from the personal injury action. (Heim Dep. at 5–9, 90–91, 102–03.)

In April 1991, Heim underwent surgery on her back for injuries suffered in the automobile accident. (Heim Dep. at 21, 26.) Approximately, six months later Heim's surgeon, Dr. LeVan, evaluated her postoperative condition. In a letter to Fisse dated October 21, 1991, Dr. LeVan stated that "with the injury she sustained ... it is not unreasonable to postulate she might require [additional] surgery ... at some time in the future." (Fisse's Mot.Summ.J., Ex. 3 at ¶ 7.) Because he could not accurately predict Heim's future medical condition, treatment or expenses, Dr. LeVan further advised waiting until April 1992, "a year from the date of surgery" before making "any elemental decisions" concerning the settlement of insurance claims, characterizing any determination by Heim to "settle the situation now" as "a gamble." (*Id.* at ¶ 8.)

On November 4, 1991, Heim met with Fisse at his office to discuss her case relative to her medical condition as evaluated in the October 21, letter from Dr. LeVan. (Heim Dep. at 76–78, 99–100; Fisse's Mot.Summ.J., Ex. A, Affidavit of Fisse at ¶ 9). At this meeting Fisse cautioned that they should wait to file suit because of the likelihood of incurring additional medical expenses. (Heim Dep. at 76, 198–99.) Heim came away from this meeting feeling "relieved" because "we were going to sue my own insurance so there will be enough money to cover my medical bills and it was just a matter of how soon I could get them to give it to me." (Heim Dep. at 28–29.) After this meeting, in a letter to Heim's insurance company dated November 5, 1991, Fisse demanded full payment to the "policy limits." (Fisse's Reply in Opp., doc. 28, exhibit marked Attachment 1.)[1]

---

1. The driver of the other automobile involved in the accident carried an insurance policy with a

Meanwhile, at some undetermined time Heim's husband, Steve Heim, a part-time photographer, took some photographs for a friend of Susan Gettys. Susan Gettys, the Debtor's wife, desired similar photographs to use on Christmas cards for the approaching holiday so she obtained Steve Heim's telephone number from her friend. (Heim Dep. at 30, 125.) Susan Gettys telephoned the Heims and set up an appointment for Steve Heim to take the Christmas card photographs. (Heim Dep. at 30–31, 125, 133.) This appointment was later canceled. During a telephone conversation to reschedule the appointment Heim mentioned her automobile accident and personal injury claim to Susan Gettys, and that she hired an attorney but that she was dissatisfied with the progress of her case. (Heim Dep. at 32, 134.) Susan Gettys then told Heim that her husband, the Debtor herein, was an attorney who did personal injury work. (Heim Dep. at 32, 81, 136.)[2]

Subsequently, in November 1991, (Heim Dep. at 125), the Debtor telephoned the Heims to offer Steve Heim the job of photographing "Jan" a client the Debtor was representing in a personal injury action. (Heim Dep. at 137.) After taking the "Jan photographs," Steve Heim and Sharon Heim delivered the photos to the Debtor's law office. (Heim Dep. at 138.) While dropping off the "Jan photographs" Heim and the Debtor discussed her personal injury case. Heim related that she was discouraged at not yet receiving the insurance money and worried about "providing Christmas for the boys." (Heim Dep. at 138–39.) The Debtor paid for the "Jan photographs" and mentioned that he probably had another photography job for Steve Heim. (Heim Dep. at 138.)

Sometime later, still in November 1991, (Heim Dep. at 125), the Debtor telephoned Steve Heim to offer him the job of photographing another injured client named Creekmore. (Heim Dep. at 139–141.) The Heims' records indicate the "Creekmore photographs" were either taken, developed or delivered to the Debtor on November 27 or 29, 1991. (Heim Dep. at 142.) At the meeting to deliver the "Creekmore photographs" the Debtor brought up the topic of Heim's personal injury claim, asking Heim "what was going on with my case, had I decided to do anything about it, had Mr. Fisse filed any motions or whatever in court.... [W]hat was the doctor saying and different questions here and there." (Heim Dep. at 142–43.) Heim and the Debtor then "tried to figure up how long it had been since the accident," and Heim again told the Debtor she was upset because it had been a long time and she still did not have her money. At this meeting the Debtor told Heim that he could get her the insurance money, prompting Heim ask "are you sure?" The Debtor responded "yeah" to which Heim said "fine." (Heim Dep. at 142–43.)

Sometime after the delivery of the "Creekmore photographs" but before December 15, 1991, Sharon Heim and Steve Heim went to the Gettys' house to take the Christmas card photographs. (Heim Dep. at 143–44.) While positioning photography equipment at the Gettys' house Heim complained of pain in her back. (Heim Dep. at 80–82.) Heim and the Debtor again talked about her personal injury case and how the Debtor obtained a large sum of money for one of his clients in a similar case. According to Heim, during this conversation the Debtor told her "if that [Heim's case] would have been my case, I could have gotten it done sooner." (Heim Dep. at 34–38, 82.)

$12,500 limit on payments to Heim for her injuries. An underinsurance clause in Heim's insurance policy allowed for up to $100,000 to make up for any amounts not paid by the other driver's policy. Therefore, from these two insurance carriers Heim was limited to recovering a maximum of $100,000. (Heim Dep. at 19–20, 48–49.)

2. Heim's deposition was taken on two separate dates April 14, 1993 and September 10, 1993. At the first session Heim was unsure as to the sequence of events following her telephone conversations with Susan Gettys. Prior to the second session Heim located records concerning her husband's photography business. (Heim Dep. at 125–26.) Based upon these records Heim was able to place the events in a chronological order. (Heim Dep. at 132–45, 151–53.) This Court finds the order of events described by Heim at the second deposition session to be supported by other documentary evidence, and such forms the basis for the facts herein.

On or about December 15, 1991, the Gettys came to the Heims' house to review proofs of the Christmas card photographs. (Heim Dep. at 144, 145.) At this meeting the Debtor and Heim again discussed her case, with Heim informing the Debtor that it was still not settled. According to Heim, at this meeting the Debtor told her that "he could settle it" but that she would need to "fire Mr. Fisse before he [the Debtor] could really do anything with the case." (Heim Dep. at 39, 41–42, 87–88, 90.)

Between the delivery of the "Creekmore photographs" and December 15, 1991, Heim decided to hire the Debtor as her attorney. (Heim Dep. at 146, 150, 153–155.) At a meeting in the Debtor's law office the Debtor drafted a letter stating what Heim should say to Fisse in order to dismiss him as her attorney in the personal injury action. The Debtor told Heim to copy the letter in her own handwriting before sending it to Fisse. Finding the language of the Debtor's draft "too harsh," Heim changed some of the wording of the dismissal letter. (Heim Dep. at 44–45, 53–57, 97, 157–58.) The dismissal letter Heim mailed to Fisse is postmarked December 26, 1991. (Heim Dep. at 66, 97–98, 147.) The contract hiring the Debtor as Heim's new attorney in the personal injury action is dated December 28, 1991. (Debtor's Mot. in Limine, doc. 25, Ex. 1 and Heim Dep. attached Def.'s. Ex. C, *Retainer Contract*.) At the time of his dismissal Fisse had not filed a lawsuit regarding Heim's personal injury claim. (Heim Dep. at 69–71.)

On January 21, 1992, the Debtor filed a lawsuit on behalf of Heim. (Heim Dep. attached Pl.'s Ex. 8.) Sometime around the end of May 1992, the Debtor settled Heim's personal injury action for a total of $96,000. Of this amount the Debtor withheld $32,000 for his fee and $270.50 as reimbursement for expenses. Heim received the remaining $63,729.50 in full settlement of her claim. (Debtor's Mot. in Limine, doc. 25, Ex. 2.)

Subsequently, Fisse filed an action in the Clermont County Court of Common Pleas against the Debtor and Heim to recover attorney fees attributed to his representation of Heim. In the same action, Heim filed a cross-claim against the Debtor alleging that he fraudulently promised her that he would pay Fisse's attorney fees, thereby inducing her to fire Fisse and hire the Debtor. (Resp. to Debtor's Obj. to Claim, doc. 38, at 1–2, doc. 1.) The Debtor then filed the instant bankruptcy case, effectively postponing the trial in the Court of Common Pleas. Fisse and Heim settled their portion of the Common Pleas action, agreeing to entry of a judgment against Heim and for Fisse in the amount of $15,000, and that Heim assign her claim against the Debtor to Fisse. (Resp. to Debtor's Obj. to Claim, doc. 38 at 2–3; Proof of Claim, filed July 10, 1996, and attached exhibit.)

Fisse filed a claim against the Debtor's bankruptcy estate for $25,000 in attorney fees attributed to his representation of Heim and $25,000 in punitive damages and interest. (Fisse Proof of Claim #2 filed June 23, 1995.) Additionally, based upon the assignment received from Heim, Fisse filed a second claim for $15,000. (Fisse Proof of Claim, filed July 10, 1996.) These claims form the basis for the instant summary judgment motions.

### Summary Judgment

Federal Rule of Civil Procedure 56, applicable to bankruptcy cases through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056(c). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. If the moving party carries this initial burden the non-moving party must then demonstrate the existence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23,

106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To accomplish this the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## Termination of Attorney Employment and Tortious Interference with Contractual Relationships

 Under Ohio law, when "an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and the client is express or implied, the attorney is entitled to recover the reasonable value of services rendered prior to the discharge on the basis of *quantum meruit*." *Fox & Assoc. Co. v. Purdon*, 44 Ohio St.3d 69, 72, 541 N.E.2d 448, 450 (1989). Additionally, "the discharge of an attorney by his client may form the basis for a cognizable cause of action for tortious interference." *Madorsky v. Bernstein*, 89 Ohio App.3d 550, 552, 626 N.E.2d 694, 695 (1993).

In assessing a cause of action for tortious interference with contractual relationships, Ohio courts and federal courts applying Ohio law have long relied upon *Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 379 N.E.2d 235 (1977). *See, e.g., Lakeland Anesthesia Group v. Ohio State Medical Board*, 61 Ohio Misc.2d 804, 585 N.E.2d 577 (Ct. of Claims 1990); *Wolf v. McCullough–Hyde Memorial Hospital*, 67 Ohio App.3d 349, 586 N.E.2d 1204 (1990); *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115 (6th Cir.1981). *Juhasz* was decided with reliance upon the Restatement of the Law, Torts (1939), commonly known as the First Restatement of Torts. *Juhasz*, 55 Ohio App.2d at 57, 379 N.E.2d at 238.

With publication of the Restatement of the Law, (Second) Torts (1979), also known as the Second Restatement of Torts, a split occurred within the Ohio Courts of Appeals. Some Ohio appellate districts modified *Juhasz* by adopting the Second Restatement of

Torts. *Walter v. Murphy*, 61 Ohio App.3d 553, 555, 573 N.E.2d 678, 679 (1988); *Akron–Canton Waste Oil, Inc., v. Safety–Kleen Oil Services, Inc.*, 81 Ohio App.3d 591, 598, 611 N.E.2d 955, 960 (1992); *Hoyt, Inc., v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088, 1091 (1995). Other appellate districts chose not to adopt the Second Restatement. *Smith v. Ameriflora 1992, Inc.*, 96 Ohio App.3d 179, 186, 644 N.E.2d 1038, 1043 n. 1 (1994); *Wolf*, 67 Ohio App.3d at 349, 586 N.E.2d at 1204. Moreover, throughout this time the Ohio Supreme Court did not formally recognize the common law cause of action for tortious interference with a contractual relationship. *Kenty v. Transamerica Premium Insurance Co.*, 72 Ohio St.3d 415, 418, 650 N.E.2d 863, 866 (1995); *see generally, Dougherty v. Parsec, Inc.*, 872 F.2d 766, 770 (6th Cir.1989) (noting during this time that "Ohio law on the tort of tortious interference with contract is not clear"). Recently, however, the Ohio Supreme Court joined "the trend of other Ohio courts . . . [recognizing] the tort of tortious interference with a contractual relationship" and "adopt[ing] the analysis" of the Second Restatement. *Kenty*, 72 Ohio St.3d at 418–19, 650 N.E.2d at 866; *accord A & B–Abell Elevator Co., v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1294 (1995) (citing *Walter v. Murphy, supra*, with approval for modifying *Juhasz* by adoption of the Second Restatement).

 "The torts of interference with business relationships and contract rights generally occur when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B–Abell Elevator*, 73 Ohio St.3d at 14, 651 N.E.2d at 1294. "[T]o recover a claim for intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Kenty*, 72

Ohio St.3d at 419, 650 N.E.2d at 866.[3]

■ In the instant case, this Court finds that the existence of a contract between Fisse and Heim is uncontroverted. (Heim Dep. attached Pl.'s Ex. 2. *Contract for Contingent Fee Arrangement.*) Similarly, based upon Heim's deposition testimony of conversations between herself and the Debtor concerning her personal injury action, (Heim Dep. at 39, 41–42, 87, 90, 138–39, 142–43), and the Debtor drafting a letter stating what Heim should say to Fisse in order to dismiss him as her attorney, (Heim Dep. at 44–45, 53–57, 97, 157–58), this Court finds it indisputable that the Debtor had knowledge of the contract. Additionally, based upon the Debtor telling Heim that she was "wasting her time" with Fisse and that he could get her the settlement money faster than Fisse, (Heim Dep. at 36, 39, 42, 82–83, 89–90, 92–93, 94, 140–41), that she would need to fire Fisse before he could take over her case, (Heim Dep. at 39, 42–43, 81–83, 90, 94), that he would "take care of Fisse" from his portion of the settlement money, (Heim Dep at 43, 52, 90–91, 109, 112–13, 158, 160, 163), the Debtor drafting the Fisse dismissal letter for Heim, (Heim Dep. at 44–45, 53–57, 97, 157–58), and Heim's deposition testimony that it was her feeling that the Debtor gave her husband the "Jan" and "Creekmore" photography assignments as a way of taking over her personal injury case, (Heim Dep. at 47, 100, 154–55), this Court finds that the Debtor intentionally leveraged such against Heim's known poor financial situation to procure a breach of the contract between Heim and Fisse. The issue then narrows down to whether the Debtor was justified in interfering with the contract.

■ Pursuant to Ohio law, it is well established that among business competitors the "advancement of a bona fide business interest privileges any interference not tainted by unlawful means." *Bowman v. Marshall*, No. 11816, 1990 WL 162578 at *2 (Ohio Ct.App. Oct. 22, 1990); *accord, Pearse v. McDonald's Systems of Ohio, Inc.*, 47 Ohio App.2d 20, 23, 351 N.E.2d 788, 790 (1975); *Donald G. Culp Co. v. Reliable Stores*, 14 Ohio App.3d 161, 163, 470 N.E.2d 193, 197 (1983); *Madorsky*, 89 Ohio App.3d at 553, 626 N.E.2d at 696; *Canderm Pharmacal v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988). Attorneys are business competitors and are employed by clients on a terminable at-will basis. *Hoyt*, 104 Ohio App.3d at 611, 662 N.E.2d at 1096; *Madorsky*, 89 Ohio App.3d at 552–53, 626 N.E.2d at 695; *Sonkin & Melena Co., L.P.A. v. Zaransky*, 83 Ohio App.3d 169, 179, 614 N.E.2d 807, 814 (1992); *Fox & Assoc. Co. v. Purdon*, 44 Ohio St.3d at 71–72, 541 N.E.2d at 450.

■ Concerning business competitors, § 768 of the Second Restatement of Torts "provides the factors to be used in determining whether a competition is proper or improper interference." *Walter v. Murphy*, 61 Ohio App.3d at 556, 573 N.E.2d at 680; *ac-*

---

**3.** *A & B–Abell Elevator, supra,* frames the inquiry as to whether a person "without *privilege* to do so" intentionally interfered with a contract while *Kenty, supra,* cast this inquiry as whether a person lacks a *"justification."* The nomenclature notwithstanding, the inquiries posed by *A & B–Abell Elevator* and *Kenty* are harmonious. *See, Schultz v. Elm Beverage Shoppe,* 40 Ohio St.3d 326, 327, 533 N.E.2d 349, 351 (1988) (italics added) ("the term 'privilege' denotes the existence of circumstances that *justify*, or excuse, conduct that would ordinarily subject the actor to liability," *citing* the Second Restatement of Torts.) Similarly, the terminology utilized by the Second Restatement in examining whether a person's intentional interference with a contract was "improper," does not alter the inquiry. As noted in *Hoyt,* the Second Restatement inquiry as to whether a person acted properly or improperly "embraces the 'privilege' as outlined in *Juhasz"* and the First Restatement. 104 Ohio App.3d at 605, 662 N.E.2d at 1092. The Ohio Supreme Court having "adopt[ed] the analysis" of the Second Restatement, *Kenty,* 72 Ohio St.3d at 418–19, 650 N.E.2d at 866, this Court's analysis herein comports with such.

Finally, regarding the tort of intentional interference with a contract, while "the law generally require[s] proof that the defendant has acted maliciously," *Haller v. Borror Corp.,* 50 Ohio St.3d 10, 16; 552 N.E.2d 207, 212 (1990), "Ohio courts hold that actual malice such as personal ill will, spite or hatred is not an essential element of the claim. Instead, malice, as used in connection with this cause of action and in the absence of a qualified privilege, denotes an unjustified or improper interference with the contractual or business relationship." *Hoyt,* 104 Ohio App.3d at 604, 662 N.E.2d at 1091–92 (citations omitted); *see also, Canderm Pharmacal v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir. 1988).

*cord, Hoyt,* 104 Ohio App.3d at 611, 662 N.E.2d at 1096.[4] Section 768 provides:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

4 Restatement of Law (Second), Torts § 768 (1979).

 This Court finds that the contractual relation between Heim and Fisse concerns a matter involved in the business competition between Fisse and the Debtor. Additionally, this Court finds that there is no evidence to support that the Debtor's actions led to any unlawful restraint of trade. Moreover this Court agrees with the Debtor, and finds, that his purpose in obtaining the termination of Fisse's contract with Heim, the pursuit of profit, was an advancement of his competitive interests. This Court finds, however, that in advancing such interests the Debtor employed "wrongful means," thereby improperly interfering with the contract between Fisse and Heim.

The Debtor employed "wrongful means" when he misrepresented to Heim that if she were to hire him as her attorney, her obligation to pay Fisse would become the Debtor's obligation. Whether or not Heim would be responsible for Fisse's fees was a major consideration in deciding whether she would hire the Debtor:

Q. Okay. Now, getting back to Gettys Exhibit C which is your fee contract with Mr. Gettys, and you've testified that Mr. Gettys told you orally on at least three occasions, and I'm assuming all three of those occasions were prior to you signing Gettys Exhibit C, correct?

A. Stating what?

Q. Stating that Mr. Gettys would take care of any of Mr. Fisse's fees?

A. He told me that Larry [Fisse] would be able to sue him for his portion of what he felt was worth his time on the case. And I asked Robert [Gettys, the Debtor], I said, "You mean to tell me he can sue you and you can lose part of your take and he can't touch none of my money?" And he said, "Yeah, but its no problem." He said, the amount of money that he would make off of this, he would be more than willing to settle with Larry. So I just—I assumed it was—he told me it was something that lawyers do, they do it all the time, and I believed him. I assumed that it would be done correctly.

Q. Quite obviously, Mr. Gettys would have told you that prior to December 28th, 1991 or before you hired Mr. Gettys?

A. Yes.

Mr. Fitzgerald: I'll object to "quite obviously." Do you remember when he told you?

A. Well I know he at least told me that once before I signed because that was a major deal. I don't want to settle one lawsuit knowing I have another one com-

---

**4.** The Debtor and Fisse assert case law relying upon § 767 to analyze whether the interference is improper. (Debtor's Mot.Summ. J. at 6; Fisse's Mot.Summ.J. at 9.) Given the competition aspect, however, § 768 provides the correct framework to determine the whether the interference is improper. *See, Brookside Ambulance, Inc. v. Walker Ambulance Service,* 112 Ohio App.3d 150, ——, 678 N.E.2d 248, —— (1996) ("Section 768 of the Restatement is a special application of Section 767," *citing* 4 Restatement of the Law (Second) Torts § 768 cmt. b (1979)); *see also, Hoyt,* 104 Ohio App.3d at 611, 662 N.E.2d at 1096 (specifically recognizing the application of § 768 to business competition between attorneys).

ing down my back. That doesn't seem to make a lot of sense.

(Heim Dep. at 112–13) (clarifications added) (*See also, Heim Dep.* at 43–44.) Furthermore, Heim thoroughly relied upon the Debtor's representations that payment of Fisse's fee was strictly between the Debtor and Fisse:

Q. Please listen to my question. Would you agree with me that there is not any language in that document [Gettys Exhibit C, the employment contract between the Debtor and Heim] which says Bob Gettys will take care of Larry Fisse's attorney fees?

A. It was understood by me and my husband, Steve, that this is an attorney thing, from going from one attorney to another. Mr. Gettys explained to us that when a second attorney takes over somebody else's case that they have to be reimbursed for their time in the case, which I agreed upon 100 percent because I know that Mr. Fisse did work on my case.

Q. Do you have anything in writing, anywhere, which is either signed by yourself or Mr. Gettys reflecting that understanding?

A. No, except verbally from Mr. Gettys to myself and my husband.

Q. Is it your position, then, that Mr. Gettys made an oral contract with you, over and above what's in Gettys Exhibit C, to take care of the attorney fees of Larry Fisse?

\* \* \* \* \* \*

A. There wasn't a contract thing. It was explained to us that this was something that had to be done from attorney to— attorney two to attorney one, its attorney law or something; that just the way it was done. He said that Mr. Fisse would be entitled. And I asked him, "How much will this be? Will this come out of my part of the settlement?" And Mr. Gettys told us no, it comes out of his share because Fisse had worked on the case. I was under the impression that these two lawyers would divide up and figure out who owes who what among that.

\* \* \* \* \* \*

Q. Were you concerned at all about the fact that Gettys' Exhibit C did not contain any language to the effect that Mr. Gettys would take care of Mr Fisse's attorney fees?

A. Not at all, because it did not concern me.

\* \* \* \* \* \*

Q. Why did you sign Gettys' Exhibits D and E [the settlement distribution agreement and receipt] without any such language that Gettys would take care of Fisse's attorney fees?

A. Because it did not concern me. That was coming—that was going to be dealt with between Mr. Gettys and Mr. Fisse. It had nothing to do with me.

(Heim Dep. at 158–61, 163) (clarifications added) (*See also, Heim Dep.* at 109.) Additionally, Heim's deposition testimony demonstrates that she informed the Debtor that Fisse's work on the personal injury claim, the second divorce action and the pre-nuptial agreement were to be paid out of the personal injury settlement money:

Q. Now the fees or the money that you owed Larry Fisse, are those the fees for your prior divorce and your pre-nuptial agreement?

A. Yes.

Q. Those are the fees you were talking about owing Mr. Fisse?

A. Yes. I was under the impression from Gettys, he had told myself and my husband, Steve, that if anything, Larry [Fisse] would sue him for what he felt his time on the case was worth. And I asked Robert [Gettys, the Debtor], and I said, "Well, okay, then he can take some of your money and this would be okay with you?" And he said, "Yes, that was fine," that's the way they do it, you know, it's done all the time.

(Heim Dep. at 91) (clarifications added).

The Debtor misrepresented to Heim that if she were to hire him as her attorney her obligation to pay Fisse would become the Debtor's obligation, that Heim would not be involved but rather that paying Fisse's fees would be handled strictly between the Debtor and Fisse. This is contrary to long estab-

lished Ohio law, which is replete with cases consisting of a discharged attorney seeking to enforce a disavowed employment contract against a former client. *See e.g., Scheinesohn v. Lemonek,* 84 Ohio St. 424, 95 N.E. 913 (1911) *and Roberts v. Montgomery,* 115 Ohio St. 502, 154 N.E. 740 (1926) (under an express employment contract attorney discharged without just cause may recover full contract price); *see also, Bolton v. Marshall,* 153 Ohio St. 250, 257, 91 N.E.2d 508, 511 (1950) (preserving the rule of *Scheinesohn* and *Montgomery,* but holding that under an implied contract recovery is based upon *quantum meruit* ); *but see, Fox & Assoc. Co. v. Purdon,* 44 Ohio St.3d at 72, 541 N.E.2d at 450 (overruling *Scheinesohn* and *Montgomery* and overruling *Bolton* in part, holding that an attorney discharged with or without just cause may recover on the basis of *quantum meruit* irrespective of whether the contract is expressed or implied) *and Madorsky,* 89 Ohio App.3d at 550, syllabus, 626 N.E.2d at 694 ("attorney who was discharged by client is only entitled to recover from client reasonable value of services rendered prior to discharge on basis of quantum meruit").[5]

▪ Moreover, that the Debtor may have been unaware or unsure of Ohio law does not alter that he misrepresented to Heim the obligation she owed Fisse. This Court adheres to the common sense rule rooted in the standards of professional competence and espoused by courts in Ohio; an attorney is presumed to know the law, and it is incumbent upon an attorney to know the law in an area in which he is practicing, particularly when rendering legal advice. *See, United States v. Hook,* 781 F.2d 1166, 1172 n. 8 (6th Cir.1986) (attorneys are expected to know the law of the case they are trying); *In re Connors,* No. 95CA–C–05–025,

1995 WL 557019, at \*2 n. 2 (Ohio Ct.App. Sept. 1, 1995) (an attorney "is one who is presumed to know the law"); *Reilley v. Richards,* 69 Ohio St.3d 352, 355, 632 N.E.2d 507, 510–11 (1994) (Bryant, J., dissenting) ("This court has always considered licensed lawyers to be competent enough to know those things which lawyers are required to know"); *State v. Samilton,* No. 60265, 1992 WL 80046, at \*13 (Ohio App.Ct. Apr. 16, 1992) ("counsel who bills ... his client for legal services is presumed to know the law").

Based upon the foregoing, this Court finds that the Debtor, without privilege or justification, improperly induced and purposely caused Heim to discharge Fisse as her attorney, thereby tortiously interfering with the contract between Fisse and Heim.[6]

### Damages

▪ The employment contract between Heim and Fisse was a contingent fee contract. (Heim Dep., attached Pl.'s Ex. 2, *Contract for Contingent Fee Arrangements.*) "[I]f a contingent fee agreement is in effect at the time of the discharge, the discharged attorney recovers on the basis of *quantum meruit,* and not pursuant to the terms of the agreement." *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry,* 68 Ohio St.3d 570, 573, 629 N.E.2d 431, 434 (1994) (footnote omitted); *see also, Belovich v. Saghafi,* 104 Ohio App.3d 438, 662 N.E.2d 391 (1995) (per curiam). *Lansberry* sets forth the standard for determination of "the reasonable value of a discharged contingent-fee attorney's services in *quantum meruit.*" 68 Ohio St.3d at 576–77, 629 N.E.2d at 436–37. Neither Fisse nor the Debtor addresses a reasonable value for Fisse's services based upon *Lansberry.* Additionally, although

---

5. For a discussion on the increasing problem of "case stealing" and a suggested departure from current law, *see, Reid, Johnson, Downes, Andrachik & Webster v. Lansberry,* 68 Ohio St.3d 570, 578–84, 629 N.E.2d 431, 437–42 (1994) (Douglas, J., concurring in part and dissenting in part), advocating a return to *Bolton* and adoption of a rule excluding the client and confining the settlement of disputes over fees realized from contingent fee contracts to between the discharged and subsequent attorney.

6. As additional grounds for finding wrongful means, Fisse alleges that the Debtor committed several violations of the Code of Professional Responsibility; i.e.—volunteered legal advice and then accepted employment, recommended his own employment, held himself out as a personal injury specialist and gave advice motivated by his personal benefit. (Fisse's Reply in Opp., doc. 28, at 9.) Given the findings herein, this Court believes that an inquiry into alleged violations of the Code of Professional Responsibility is best undertaken in the first instance by the proper state disciplinary body.

Fisse's proof of claim asserts punitive damages and interest, (Fisse Proof of Claim # 2 filed June 23, 1995), Fisse's motion for summary judgment does not request such relief and neither Fisse nor the Debtor addresses the propriety of such an award.

Therefore, by March 10, 1997, Fisse is to file with this Court pleadings and any supporting evidence regarding an award of damages. The Debtor may file an opposition to Fisse's pleadings and evidence by March 24, 1997.

### Conclusion

This Court concludes that there is no genuine issue as to any material fact and that the Debtor, without privilege or justification, improperly induced and purposely caused Heim to discharge Fisse as her attorney in the personal injury action, thereby tortiously interfering with the contract between Fisse and Heim. Accordingly, the Debtor's motion for summary judgment is hereby denied. Fisse's motion for summary judgment is hereby granted, subject to the determination of an award of damages. The Debtor's objection to Fisse's claims is overruled.

IT IS SO ORDERED.